

**U.S. Department of Justice**
Federal Bureau of Prisons

*Metropolitan Correctional Center*

*Chicago, IL 60605*

**FORENSIC EVALUATION**
**Title 18, U.S.C., § 4241(d)**

**NAME: EDWARDS, Joshua**
**REGISTER NUMBER: 73844-018**
**DATE OF BIRTH: April 26, 1992**

**DOCKET NUMBER: 6:22-cr-201-WWB-LHP**
**DATE OF ADMISSION: August 24, 2023**
**DATE OF REPORT: January 25, 2024**

## IDENTIFYING INFORMATION AND REASON FOR REFERRAL

Joshua Edwards (hereafter referred to as the defendant) is a 31-year-old male referred to the Metropolitan Correctional Center in Chicago, Illinois (MCC Chicago) under the provisions of Title 18, U.S.C., §§ 4241(d) and 4247.

Per the Court Order filed on April 28, 2023, the Court noted that on December 16, 2022, Judge David A. Baker appointed Dr. Jeffrey Danziger, M.D., to conduct a competency evaluation pursuant to Title 18, U.S.C., § 4241 and 4247. On February 2, 2023, the court and counsel received a copy of the report in which Dr. Danziger opined the defendant was feigning his condition and malingering and therefore competent to proceed. Following a status conference on February 13, 2023, the Court granted the defendant's oral motion for a second competency evaluation. On April 17, 2023, the Court and counsel received a copy of the forensic evaluation from the Bureau of Prisons, in which the forensic psychologist, Jessica Micono, Psy.D., ABPP (Forensic) offered a tentative opinion that the defendant was not currently competent to proceed. At the status conference on April 28, 2023, both defense counsel and the United States did not object to Dr. Micono's evaluation and opinion. Subsequently, the Court found the defendant not competent to proceed and ordered he be committed to the custody of the Attorney General to be hospitalized for treatment in a suitable facility pursuant to Title 18, U.S.C., 4241 (d).

## LEGAL CHARGES

According to the Indictment, filed on December 7, 2022, the defendant is currently charged in the Middle District of Florida, Orlando Division, with the following:

Title 18, U.S.C., § 1349 Conspiracy to Commit Bank Fraud
Title 18, U.S.C., §§ 1344 and 2 Bank Fraud

These charges are alleged to have occurred "beginning on an unknown date, but at least as early as on or about April 3, 2020 and continuing through at least in or about September 17, 2020."



Exb 2

Title 18, U.S.C., §§ 1014 and 2 False Statement to Lending Institution

This charge is alleged to have occurred on or about April 6, 2020.

Title 18, U.S.C., § 1546(a) Visa Fraud

This charge is alleged to have occurred on or about June 14, 2021.

## SOURCES OF INFORMATION

The present evaluation was conducted in person while the defendant was at MCC Chicago. Throughout the evaluation period, the defendant was routinely observed on his housing unit by myself, correctional staff members, psychology staff members, and unit team staff members. It is my opinion that the available information was sufficient to complete the evaluation. I used information obtained from my interviews with the defendant, as well as the sources listed in the determination of my opinions, but have included only the information pertinent to the psycholegal questions asked by the Court.

The following sources of information were utilized for the purpose of completing the present evaluation and report:

1. Order, United States District Court, Middle District of Florida, Orlando Division; filed on February 13, 2023.
2. Indictment, United States District Court, Middle District of Florida, Orlando Division; filed on December 7, 2022.
3. Transcript of Initial Appearance Hearing Before the Honorable David A. Baker, United States Magistrate Judge on December 14, 2022, United States District Court, Middle District of Florida, Orlando Division; filed on December 15, 2022.
4. USM-129 Individual Custody/Detention Report; printed May 12, 2023.
5. Criminal Docket; printed December 19, 2023.
6. Electronic medical, mental health, and security records maintained by the Bureau of Prisons (BOP).
7. Select telephone calls placed from the defendant's account while at MCC Chicago.
8. Forensic Evaluation, authored by Jessica Micono, Psy.D., ABPP (Forensic); dated April 17, 2023.
9. In addition to routine observation and brief interactions[1] on various dates throughout the evaluation period, interviews with the defendant were conducted on the following dates:
    i. August 28, 2023 for approximately 10 minutes. I attempted to meet with the defendant on November 16, 2023, and December 8, 2023; however, he declined to meet with me on each occasion.

[1] Approximately 2-5 minutes, typically in passing while I was on the housing unit. The defendant approached me to ask various questions about his evaluation on approximately 4-6 occasions.

I also contacted the following individuals for collateral information:

1. Charles E. Taylor, Jr., defense counsel; email correspondence, various dates.
    i. Telephone communication on December 19, 2023.
    ii. Telephone communication on December 28, 2023 for approximately 51 minutes.
2. Kara Wick, Assistant United States Attorney (AUSA); e-mail correspondence, various dates.
3. Defense counsel also provided me with names and contact information for two family members to attempt to obtain collateral information.
    i. I attempted to contact the defendant's mother, Mary Edwards, via telephone on December 28, 2023; however, at the time of writing this report, she has not returned my call.
    ii. I also attempted to contact the defendant's sister, Joy Edwards, via telephone on December 28, 2023; however, at the time of writing this report, she has not returned my call.

## NOTIFICATION

The defendant arrived at the Metropolitan Correctional Center in Chicago, Illinois (MCC Chicago) on August 24, 2023, and was seen for a forensic intake on August 28, 2023. During the forensic intake, I informed the defendant of the nature and purpose of the evaluation. I also attempted to review this information with the defendant on several occasions during the evaluation period in an effort to attempt to have him cooperate with the evaluation or engage with offered restoration programming. As an informal measure of his reading and comprehension ability during the forensic intake, I asked the defendant to read the first few sentences of the Statement of Understanding form and he stated, "In school, I didn't do so good at reading and writing, so you'll [need to] explain something to me." He then read the title of the form, read the first sentence on the form and inquired if he would need to sign below, which is what the form states. I asked him if he wanted to read the rest of the form to himself or if he would prefer I verbally explain it to him and he stated that he would prefer to read the form to himself. He was provided with an opportunity to review the form on his own and asked to inform me when he was finished reading the form. When I began asking him questions about the information in the form to assess his understanding of the information, he said, "My lawyer told me not to sign anything without talking to him." I informed him that he was not required to sign the form. When I attempted to continue asking him questions to assess his understanding of the information in the form, he repeatedly stated that he could not "answer any questions without my lawyer." The defendant was verbally notified of the nature, purpose, and approximate duration of the present evaluation. He was informed that the information discussed, any testing conducted, records received, or additional information received during the evaluation period would be included in a report that I would submit to the Court. I informed him that the report would also be sent to his defense attorney and the AUSA assigned to his case. I informed him that I may be called to testify about the evaluation and/or report I submit to the Court and informed him of my obligations as a mandated reporter. He was informed that the present

evaluation was not treatment and that my role as an evaluator is neutral. He was informed that he would be at the institution for approximately 120 days for treatment and that he would be seen by another mental health staff member for treatment. The defendant did not ask questions about the evaluation or the information in the form; however, when asked questions, including what the date was, he stated, "I can't do anything else without my lawyer." He declined to sign the voluntary statement of understanding form and declined to answer other questions, including whether he had his attorney's contact information in order to contact him. He was informed how to request non-monitored legal calls as well as request medical appointments and meet with psychology services in either an urgent or non-urgent situation.

**DATA UPON WHICH FORENSIC OPINION IS BASED**

This report is structured to address the primary issues posed by Title 18, U.S.C., §§ 4241 and 4247 and although additional information was reviewed, this report provides a detailed review of the relevant information upon which I relied to form my opinion.

According to the **Forensic Evaluation authored by Jessica Micono, Psy.D., ABPP (Forensic), dated April 17, 2023,** Dr. Micono evaluated the defendant while he was at the Federal Detention Center in Englewood, Colorado (FDC Englewood) pursuant to a court order. Per Dr. Micono's report, the defendant declined to participate in a competency-specific interview; however, he did participate in psychological assessments administered, which are further detailed in the relevant section in this report. Regarding diagnoses, Dr. Micono noted to rule out Malingering and rule out Autism Spectrum Disorder, Level 1. As summarized in Dr. Micono's report:

> "In this case, rule-out is used to indicate that there is some evidence for the consideration of the diagnosis in question, but not enough evidence to definitively confirm or exclude the diagnosis. It does not suggest that the diagnosis had been ruled out."

Per Dr. Micono's report, the defendant "did not participate meaningfully in assessment measures of his competency to stand trial" and additional "attempts to encourage his participation were unsuccessful." Dr. Micono opined that based on the defendant's presentation and the information available at that time, there was,

> "...evidence to suggest he may have a mental disorder (autism spectrum disorder) that is significantly impairing his present ability to understand the nature and consequences of the court proceedings against him, and his ability to properly assist counsel in his defense; however, there is also evidence that he has no mental disorder impairing his present abilities."

Dr. Micono noted that she was "offering a tentative opinion that Mr. Edwads is not currently competent to proceed."

**The person's history and present symptoms [18 U.S.C. § 4247 (c) (1)]**

Present Symptoms

The defendant's mental status remained consistent throughout the evaluation period at MCC Chicago. Discrepancies, if applicable, are noted and dated.

During the forensic intake with the defendant on August 28, 2023, when I asked the defendant for his BOP issued identification card to confirm his identity, he asked me, "What's this for?" I explained my role and why I was meeting with him and he then asked me if he could "go to the washroom" and asked how long I would be meeting with him. After I told him I would only be meeting with him briefly, he stated, "I should probably go then." I asked him to return to my office when he was done, which he did approximately two minutes later. When the defendant returned to my office, I informed him again of my role and the reason why we were meeting. The defendant declined to answer my questions and repeatedly stated that he is "Gonna have to ask my lawyer a lot of questions" and that he is "not supposed to talk about anything without my lawyer." He declined to answer questions, even pertaining to his mental health or the date. He also repeatedly interrupted me by saying that he could not speak to me without his attorney when I attempted to finish explaining the purpose of the evaluation and why he is at MCC Chicago.

During the forensic intake, the defendant identified himself by first and last name; however, when I asked him for his first and last name, he paused for several seconds before responding. He declined to answer my question when I asked him what the date was and said, "I can't do anything without my lawyer." The defendant was wearing his jail issued uniform that appeared to be free of tears or stains. He provided me with his identification card when I asked for it, and he had it located in his sock. He responded to questions verbally, though he repeated the same phrases to me and repeatedly interrupted me. For example, as I tried to explain the notification information to him, he kept interrupting me to tell me he doesn't understand; however, when I attempted to explain the information to him again in simpler terms, he still interrupted me and did not listen to the explanation I provided him. He continued to interrupt me as I explained to him the reason why he was here, how long he would be here, and the expectations of the program. He also asked me several questions, which I answered. Specifically, he asked what type of groups he would be in, what the word "forensic" meant, and whether I would be explaining the information in the statement of understanding form to him. Despite this, he did not answer questions asked nor appear to listen to the explanations provided to him. At several points, the defendant was looking around my office and appeared to not be listening. He responded to select questions asked, but repeatedly stated that he could not answer questions without his lawyer or stated that he had a lot of questions for his lawyer. Despite me informing him that the information I needed to review with him was important, he declined to answer questions and repeatedly stated, "I'm not supposed to do anything without my lawyer." The defendant did not exhibit memory impairment, as evidenced by his ability to return to my office without assistance and provide me with the identification card I had requested. There was no evidence of psychotic symptoms or mood related symptoms. There was no

evidence of suicidal or homicidal ideation, intent, or plans. After the defendant reviewed the Statement of Understanding form and was informed that the present evaluation was related to his legal situation, he refused to answer questions or engage in further discussion about the evaluation other than stating that he "Can't answer any questions without my lawyer" and that he is "not supposed to do anything without my lawyer." When I attempted to meet with the defendant on several other occasions during the evaluation period, he made similar statements that he could not speak to me without his attorney or that he wanted to speak to his attorney prior to speaking with me.

On November 16, 2023, when I approached the defendant's housing area to attempt to meet with him, he was in his assigned room laying in a bed. When I informed him that I wanted to meet with him for his evaluation, he removed what appeared to be a wash cloth from his eyes, looked at me, and stated, "My lawyer told me not to talk to you without him, so I refuse." I again provided him with a brief explanation of the purpose of the evaluation and how to request a non-monitored legal call; however, as I was explaining this information to him, he put what appeared to be the wash cloth over his eyes again, laid back down, and appeared to not be attending to the explanation provided to him.

While at MCC Chicago, the defendant was housed on a **jail-based restoration unit** where my office, as well as the offices of several other psychology staff members are located. In addition to the behavioral observations I made, other staff members also observed the defendant engaging with peers occasionally on the housing unit. As part of the jail-based restoration program, the defendant was enrolled in educational competency restoration groups, a daily morning meeting on the housing unit, and a periodic recreational group. Per the available electronic documentation at this time, the defendant was also enrolled in the Slater Method competency restoration group due to his rule out diagnosis of Autism Spectrum Disorder, Level 1, per Dr. Micono's report dated April 17, 2023. The educational competency restoration groups and daily morning meetings are typically facilitated by the Advanced Care Level Psychologist (ACLP) or a treatment specialist. Based on the available documentation at this time, the ACLP reported meeting with the defendant individually on September 21, 2023, October 12, 2023, and December 7, 2023 to discuss his lack of participation in treatment programming. Per a note by the ACLP dated September 9, 2023, the defendant reportedly indicated he had no plan to participate in programming and that he would only speak with his lawyer. Per a note dated October 12, 2023, the ACLP noted that she met with the defendant "for a confidential meeting to attempt to gain information about why" the defendant was not engaging in unit programming. Per the note, the defendant reportedly indicated he had no interest in participating in the program and that he could not answer questions without his lawyer present. Per the note, the ACLP attempted to explain the purpose of his "placement at MCC Chicago" and the defendant reportedly reiterated that he had no plan to participate in programming and that he would only speak with his lawyer. The note also stated that the ACLP had noticed "a pattern of behavior wherein [the defendant] is out on the unit socializing with other inmates and watching television/playing board games until this writer leaves her office to head [*sic*] to

the main floor" to facilitate morning meetings or treatment groups. Per the note, the defendant reportedly then "returns to his cell to seemingly avoid having contact with treatment staff." Per a note dated December 7, 2023, the ACLP noted that she made "one more attempt to encourage" the defendant to participate in restoration programming. Per the note, the defendant reportedly stated he "can't talk without [his] attorney."

The defendant's progress in treatment and with the evaluation was periodically reviewed during a **weekly multidisciplinary meeting** involving myself, correctional services, executive, medical, psychology, and unit team staff members. I was informed by psychology services staff members facilitating competency restoration groups that during morning meetings on the housing unit, if the defendant was in the common area before the meetings started, he would leave prior to the meeting beginning and that he appeared to intentionally avoid being present for morning meetings, competency restoration group, and other treatment groups in which he was enrolled. During a multidisciplinary meeting on September 1, 2023, I was informed by psychology services staff members facilitating treatment groups that the defendant would not attend groups and he reportedly "refused to participate or answer any questions." Group facilitators explained the restoration program to the defendant and he reportedly informed them that he would not be participating in treatment groups. During a multidisciplinary meeting on October 27, 2023, I was informed by psychology services staff members facilitating groups that the defendant reportedly was not attending treatment groups and that he reportedly relayed that his lawyer said not to, and that he would not share anything without his lawyer present. During that meeting, I also informed the individuals attending the meeting that I had contacted defense counsel to attempt to facilitate a legal call with the defendant and his attorney and had contacted unit team staff members who typically facilitate such calls to request they offer the defendant the opportunity to make a legal call. During a treatment team meeting on December 8, 2023, I informed treatment staff that I had again contacted the defendant's attorney in an attempt to facilitate a legal call to encourage the defendant to participate in the evaluation and treatment programming. During that meeting, I was informed by psychology staff members facilitating groups that although documentation noted that the defendant had participated in a recreational activity offered on the housing unit, that the defendant actually did not participate. I was informed by psychology services staff members that the defendant reportedly attended recreation on the rooftop on one occasion; however, it is unclear if there were other recreation opportunities that he had attended.

A select sample of **telephone calls made from the defendant's account**[2] were reviewed for the present evaluation. It appeared there were no emails sent or received from the defendant's account while he was at MCC Chicago. Throughout the current evaluation period, there were approximately 871 telephone calls made from the defendant's account. The telephone calls I reviewed that occurred in August were significantly different in

[2] The following includes direct quotes from select telephone calls and is not intended to be a transcript.

content and duration when compared to telephone calls he made in November, December, and January. Although nearly all of the defendant's calls reviewed included discussion of the Bible, the calls he made that I reviewed from November 2023 through January 2024, were more rapid, brief, and consisted of discussion of Bible verses and brief discussion of his functioning and overall wellbeing. Additionally, it appeared that the defendant and the individuals he was speaking to, who he referred to as his mother and sister at one point, were speaking in another language. However, at times, their speech was so rapid that it was somewhat difficult to follow what was being said even when it was clearly in English. It appeared that the defendant and his family were attempting to keep their phone calls within a limited time, as they would often ask each other how much time was left for the call, despite being on the call for only a few minutes or approximately one minute. For each of the telephone calls reviewed, the defendant appropriately responded to voice prompts including identifying himself by first and last name when prompted. He appeared to be aware of the date, as evidenced by him referring to upcoming holidays and noting an awareness of the typical schedule of the institution. The defendant also routinely discussed his functioning and acknowledged awareness that he was in a jail setting. He often discussed the food and referred to being at "the other place," presumably referring to being at FDC Englewood. Throughout the telephone calls reviewed, the defendant's speech was coherent, organized, clear, and goal directed. Of note, the defendant's telephone calls made between his arrival, August 24, 2023 through approximately September 30, 2023, with the exception of four calls in September 2023, were the maximum duration of 15 minutes. The defendant responded appropriately and accurately to prompts for his first and last name, responded to questions asked, asked follow up questions, and exhibited conversational ability in the telephone calls reviewed. However, the defendant also cautioned the individuals with whom he was speaking to not discuss specific information during the calls. During a telephone call made on August 25, 2023, to an individual listed as "Other Relation" in Grand Prairie, Texas, the defendant was told that to "be like in 'Englewood'" and the defendant responded, "Don't say the word of the other place." The defendant was also told not to "sign" anything, that he would be able to sign documents later, and to "be careful." When he was cautioned about being at a facility where individuals are "mixed up" and are not all "minimum security, like the other one," the defendant asked, "Yeah, they accept medium, low, and high, yeah?" During another telephone call made on August 25, 2023, the defendant stated, "Everything is so good out here and easier out here." The defendant also requested a specific edition of a Bible to be sent to him and stated that he had a Bible but he wanted the one he was requesting as well. During a telephone call made on August 31, 2023, the defendant again discussed the differences at MCC Chicago and "the other place," specifically saying that there was "bigger food," and it was "not small," and said, "They have lots of food." During that telephone call, the defendant was told "Remember, Joshua? You have to be... be just inconspicuous and quiet and like don't... stick out from people or flaunt or try to get your way." Another individual who appeared to be the defendant's mother based on their conversations stated, "It's time for a celebration after you leave," and said that they were "celebrating here."

In several telephone calls made, the defendant discussed his routine and the schedule of the housing unit and institution. He also routinely discussed the amount of telephone minutes allotted per month, appeared to be maintaining a record of how many minutes he had remaining for the month, and also discussed the allotted time that remained for each telephone call. The defendant also frequently asked how much time he should spend reviewing Bible verses and often asked and was provided with what appeared to be specific verses from the Bible for him to review. He also often seemed to be relaying some of the information from the Bible verses that he had reviewed. During one telephone call made on December 31, 2023, the defendant asked, "Did they say anything else on there?" However, it was unclear to me based on the conversation what he meant (i.e., whether this was related to broadcasting messages or sermons online, etc.). Based on the conversation; however, it did not appear to be a psychotic thought process. During a telephone call made on January 3, 2024, an individual on the phone appeared to be crying and the defendant responded, "I'll be home soon. It's OK."

1. **Issue**: Presence of a mental disease or defect
   **Data Considered**: In addition to relying on the data above, my opinions, diagnoses, and findings related the presence of a mental disease or defect are based on the following:

**The person's history and present symptoms [18 U.S.C. § 4247 (c) (1)]**

Self-Reported History

Because the defendant declined to answer my questions during the present evaluation or participate in interviews, there was no additional historical information obtained during the evaluation period at MCC Chicago.

The following self-reported history was directly quoted from the Forensic Evaluation authored by Jessica Micono, Psy.D., ABPP (Forensic) dated April 17, 2023:

*Mental Health History*

> "Mr. Edwards reported no history of mental health diagnoses or treatment. He said he has never taken psychiatric medication. He reported no history of suicidal ideation or attempts."

*Legal History*

> "Mr. Edwards reported no criminal history[.]"

*Substance Use History*

> "Mr. Edwards reported no history of alcohol or substance use."

*Educational History*

The following is an excerpt of the educational history section of Dr. Micono's report:

"Mr. Edwards reported doing "really good" in school. He said he never received special education classes or was required to repeat a grade. He reported graduating high school, but said he could not recall what year, noting, "It's been a while." It should be noted that the collateral documents suggested Mr. Edwards was home-schooled, and that he did earn a high school diploma in 2011.

According to Mr. Edwards, he attended schooling after high school where he was "studying the Bible because I wanted to become a preacher." He said he did not know the name of the school he attended, but indicated he completed all of the coursework. The collateral documents indicated Mr. Edwards earned a Doctor of Practical Ministry from the Wagner Leadership Institute, which it was noted was not an accredited institution. An internet search indicated their "diplomas do not certify levels of attainment, but rather accumulation of training credits." The internet search further indicated a portion of the training hours were required to be completed in a "live" format; however, it was unclear if this meant students were required to attend in-person classes."

*Employment History*

"Mr. Edwards reported no employment history. He said he has never received disability compensation."

*Medical History*

"Mr. Edwards reported no significant medical history. He stated he is not on any medications. He reported no history of head injuries."

<u>Collateral Information[3]</u>

According to **Dr. Micono's Forensic Evaluation dated April 17, 2023**, the defendant was administered the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV). The following is an excerpt of the defendant's performance on the WAIS-IV:

"The WAIS-IV is used to assess the general thinking and reasoning skills of individuals aged 16-89 years. The Full Scale IQ score provides a general overview of the person's overall thinking and reasoning skills and encompasses four domains: Verbal Comprehension, Perceptual Reasoning, Working Memory, and Processing Speed. The Verbal Comprehension Index score indicates how well the person did on tasks that measure skills in understanding verbal information, thinking with words, and expressing thoughts in words. The Perceptual Reasoning Index indicates how well the person did on tasks that require the person to examine and think about things such as

[3]The following review of collateral information contains quotes, and in such cases where written statements are cited verbatim, they may include any typographical errors that were in the original source.

designs, pictures, and puzzles, and to solve problems without using words. The Working Memory Index score measures an individual's ability to respond to oral stimuli that require the ability to hold and manipulate data in one's immediate memory, and is generally considered to be a measure of an individual's attention span. The Processing Speed Index is a measure of an individual's ability to solve various nonverbal problems as quickly as possible. The scores listed below show how well Mr. Edwards performed compared to a group of individuals the same age from across the United States. An individual may have WAIS-IV scores that fall within a wide range from extremely low to very superior. Most individuals, however, perform within the average Range. The WAIS-IV was administered on February April 3, 2023.

The Full Scale IQ is the aggregate of all scores and is usually considered to be the most representative measure of global intellectual functioning. Mr. Edwards' Full Scale IQ could not be interpreted because he demonstrated too much variability in his performance across the four indexes that make up this score.

The Verbal Comprehension Index score is a measure of acquired knowledge, verbal reasoning, and comprehension of verbal information. Mr. Edwards' verbal reasoning abilities as measured by his Verbal Comprehension Index (VCI) score of 78 (confidence interval 73-85), were in the borderline range and above those of 7% of his peers.

Mr. Edwards' score on the Perceptual Reasoning Index (PRI), which measures nonverbal reasoning abilities, could not be interpreted, as he demonstrated too much variability on the subtests that comprise this score.

Mr. Edwards' Working Memory Index (WMI) score of 53 (confidence interval 49-63) fell within the extremely low range, higher than 0.1% of his peers. He scored within the extremely low range on the Processing Speed Index (PSI), with a score of 53 (confidence interval 49-66), which was better than 0.1% of peers his age."

Dr. Micono also noted, "While it is possible Mr. Edwards does have some cognitive impairment, his complete lack of knowledge of the legal system is unreasonable," and that "He demonstrated severe memory impairment that was limited to education regarding legal concepts."

Per **BOP medical and mental health records**, the defendant was seen by medical staff for a routine health screening upon arrival to MCC Chicago on August 24, 2023. During the health intake screening, the defendant denied a history of seizures, diabetes, cardiovascular disease, hypertension, and other medical conditions. The defendant's mental status was described as "alert and oriented," behavior was described as "cooperative," appearance and psychomotor activity were described as "normal," mood was described as "appropriate to content," thought process was described as "goal directed," and thought content was described as "normal." The defendant did not endorse

any history of mental health treatment, head injury, hearing voices, or suicidal ideation. He also did not endorse current mental health treatment, symptoms, or suicidal ideation. The defendant did not endorse any history of substance abuse. Per medical documentation, the defendant did not arrive to MCC Chicago with any prescriptions. The defendant was not prescribed any psychiatric medication while at MCC Chicago.

Per Dr. Micono's report dated April 17, 2023:

"Psychiatric Evaluation Report completed by Jeffrey A. Danzinger, M.D. dated February 2, 2023[4]

"According to this report, Dr. Danzinger completed a court ordered competency evaluation of Mr. Edwards at the Orange County Jail on February 2, 2023. Dr. Danzinger indicated Mr. Edwards presented "with a very childlike demeanor..." and was "entirely unable to provide [him] with even the simplest of historical information." The report further noted that Mr. Edwards often provided repetitive responses of "mom and dad help me," and "mom and dad give me special bread." Mr. Edwards reportedly provided these same responses when asked questions about his history and current legal situation. Dr. Danzinger indicated he attempted to administer the Inventory of Legal Knowledge (ILK) to assess Mr. Edwards' response style with regard to his approach toward inquiries of his legal knowledge; however, Mr. Edwards reportedly did not provide responses to the first few questions. Dr. Danzinger indicated he additionally attempted to administer the Miller Forensic Assessment of Symptoms Test (M-FAST), which is a screening measure designed to assess for feigning or exaggerating mental health symptoms. It was noted that Mr. Edwards again did not provide responses to the questions. Dr. Danzinger noted he then attempted the coin in the hand test, which is an extremely simple measure used to screen for feigned cognitive impairment; however, Mr. Edwards reportedly did not provide any relevant responses, and instead continued to state that his parents helped him.

Dr. Danzinger reported speaking with correctional staff who often interacted with Mr. Edwards at the Orange County Jail. It was noted they indicated Mr. Edwards generally acted in a childlike fashion, although some staff reported he at times appeared to be functioning at a higher level. The report indicated that correctional staff also received reports from some of Mr. Edwards' fellow inmates that Mr. Edwards was "faking."
Dr. Danzinger provided Mr. Edwards a diagnosis of "Probable Malingering." He explained that Mr. Edwards' presentation was "very extreme, lacking even the most basic information such as his age, with the failure to respond to questioning other than saying 'mom and dad help me.'" He further stated it was his opinion that Mr. Edwards was "not truly suffering from any mental disease or defect which would render him

[4] I requested this report from defense counsel and the AUSA assigned to the case via email, but was not provided with the report due to defense counsel's concerns about the report. However, it is being summarized here as it was included in Dr. Micono's report and provides additional relevant information pertaining to the defendant.

unable to understand the nature and consequences of the proceedings against him, or which would prevent him from assisting properly in his defense.""

2. **Issue**: Ability to understand the nature and consequences of the proceedings against him or to assist properly in his defense.
**Data Considered**: In addition to relying on the data in the sections above, my opinion and findings are also based on the following data:

I spoke with **defense counsel, Charles E. Taylor, Jr. via telephone on December 28, 2023** for approximately 51 minutes to obtain additional information about the defendant's presentation and his concerns related to the defendant's competency. Defense counsel also relayed that the defendant's mother and sister may be helpful in providing collateral information and provided me with their contact information. On December 28, 2023, I attempted to contact both numbers I was provided and left voicemails with my contact information and reason for calling. However, at the time of writing this report, I have not received a response from either individual. Defense counsel also noted that he had concerns about the defendant's ability to understand his questions and that the defendant was primarily focused on his father and his father's health issues when he attempted to speak with him. Defense counsel clarified that the defendant did not appear to understand what he was saying, as he would respond to questions about his case in an irrelevant manner, such as asking if he had talked to his mother or would talk about food. This manner of conversation was inconsistent with the defendant's response style in telephone calls he made while at MCC Chicago. For example, during the telephone calls he made during the evaluation period, when the defendant discussed food or his wellbeing, he was responding to a direct question about the food or how he was functioning. Defense counsel also clarified that during the evaluation Dr. Micono conducted, he appeared via videoconference to attempt to facilitate the evaluation and that defense counsel was present for a period of time, but left the videoconference meeting at one point. Defense counsel also clarified that he had not informed the defendant that he should not participate in the evaluation without him being present and that the defendant had not contacted him to speak with him during the evaluation period at MCC Chicago, despite the defendant stating that he needed to speak with his attorney and being provided several opportunities to contact defense counsel.

The following is an excerpt that has been directly quoted from Dr. Micono's report dated April 17, 2023 pertaining to her evaluation of the defendant and his competency to proceed:

> "While Mr. Edwards participated in tests of his general cognitive abilities and cognitive response style, he initially declined to answer any questions related to the legal system. Specifically, when the ILK was first attempted with Mr. Edwards on March 21, 2023, he stated he could not answer the questions, as he had never

studied the legal system, and only "went to Bible school." He was encouraged to guess if he did not know the answer, as this test utilizes a true/false format. Mr. Edwards then stated he needed to speak with his attorney prior to answering any questions related to the legal system or his case. The nature and purpose of the evaluation were reviewed with him, highlighting the need to assess his legal knowledge. However, he stated he would not continue the evaluation until after speaking with his attorney. I contacted the AUSA and Mr. Edwards' defense attorney, Charles Taylor, informing them about Mr. Edwards' request for a legal call prior to proceeding with the evaluation. Mr. Edwards' defense attorney stated he would be present via video conferencing during the next evaluation session to encourage Mr. Edwards' participation.

I met with Mr. Edwards with Mr. Taylor present via video on March 22, 2023. Mr. Taylor encouraged Mr. Edwards to answer the legal questions. The ILK was administered, the results of which are detailed later in the report.

On April 3, 2023, I met with Mr. Edwards to conduct a competency interview, using the Revised Competency Assessment Instrument (R-CAI), which is a semi-structured interview commonly used to assess an individual's factual and rational understanding of the proceedings as well as their ability to assist in his defense. Mr. Edwards stated he did not know the answers to the first two questions, which asked him to identify his current charges and whether he was being charged with felonies or misdemeanors. I then asked him whether felonies or misdemeanors were more serious, and he again stated he did not know. I provided Mr. Edwards with education noting felonies are more serious than misdemeanors. I immediately asked him to recall this information; however, he stated he did not know which was more severe. Education was again provided and he was again immediately asked to recall this information. He again stated he did not know. Two additional attempts were made questioning him immediately after education was provided; however, Mr. Edwards maintained he did not know whether felonies or misdemeanors were more serious. He then stated he did not wish to answer the questions without speaking with his attorney. He was encouraged to participate, but continued to decline."

According to Dr. Micono's report dated April 17, 2023, the defendant's response style was also assessed during the evaluation she conducted. The following are excerpts of the assessments administered and their results:

"**Validity Indicator Profile:** Mr. Edwards was administered the non-verbal and verbal subtests of the Validity Indicator Profile (VIP). The VIP assesses how an individual approaches assessment of his or her cognitive abilities. His response pattern on both subtests were valid and compliant. In other words, he made an effort to answer the items correctly. This suggested [he] also put forth adequate effort on the WAIS-IV.

However, it is important to note that the VIP is not timed. Mr. Edwards took an extended length of time to complete this assessment.

**Inventory of Legal Knowledge (ILK):** Mr. Edwards was administered the Inventory of Legal Knowledge (ILK), which is an instrument used to assist in assessing response styles of defendants undergoing evaluations of adjudicative competence. The ILK is not a test of adjudicative competence. High scores do not indicate that a defendant is knowledgeable about legal process or competent to proceed, and low scores do not indicate that a defendant is uninformed about the legal process or incompetent to proceed. The ILK is solely a measure of response style; more specifically, it is a measure of a defendant's approach to inquiries about the person's legal knowledge. This assessment was administered on March 22, 2023.

In the case of the ILK, correct scores below 47 out of 61 are suggestive of a feigned response style. Scores between 24 and 36 are the equivalent of no knowledge whatsoever about the legal system; in other words, a score in this range is equal to an individual who is guessing. A score of 23 or below is statistically considered to be beyond chance, and suggests an intentional effort to answer items in the wrong direction.

Mr. Edwards answered 33 out of 61 true/false items correctly. His score was the equivalent to what would be expected if he were simply guessing. It suggested he did not put forth effort in answering the questions correctly. It should be noted, the ILK is not a timed assessment, and Mr. Edwards was provided an unlimited time to respond to each question.

During the **forensic intake I conducted on August 28, 2023**, I attempted to ask the defendant several competency-specific questions to assess his knowledge of the legal system at that time. However, as noted above, the defendant declined to answer any questions after he was informed that I was meeting with him to conduct a forensic evaluation and provided him with the above-mentioned information pertaining to the evaluation and report that I would be writing for the Court.

Given the defendant's consistent declining to participate in the evaluation process and statements that he needed to speak to his defense attorney, I requested unit team staff members who coordinate legal calls to assist the defendant in contacting his attorney on at least three occasions. I also emailed defense counsel, and the AUSA assigned to the case, about the defendant's lack of cooperation with the evaluation process and asked for defense counsel to attempt to speak with the defendant. I was informed by unit team staff members that each time they offered the defendant an opportunity to speak to his defense attorney on a non-monitored phone line, he declined and stated that he was "tired." Defense counsel, in addition to providing his availability in an attempt to have the defendant call him, had scheduled a legal call on December 8, 2023, and I was

informed by the housing unit officer that the defendant said he did not want to speak to his attorney. I also attempted to encourage the defendant to participate in the legal call with defense counsel, and when the defendant presented to the main floor of the housing unit where I was standing, he saw me, immediately turned around, walked down the stairs toward his room, and did not respond or make any statements. I attempted to explain to the defendant, as he walked away from the area where I was standing, that he was not meeting with me and that his attorney wanted to speak with him; however, he did not respond to me or acknowledge that he heard me.

**A description of the psychiatric, psychological, and medical tests that were employed and their results [18 U.S.C. § 4247 (c)(2)]**

Due to the defendant declining to participate in all interviews I attempted to conduct with him, I was unable to administer any additional psychological assessments, including a competency-specific forensic assessment instrument. However, the results of the assessments administered by Dr. Micono were considered in the formulation of my opinion and diagnoses. Given Dr. Micono's evaluation and assessments administered during her evaluation, it is my opinion that no other psychological assessments, aside from the forensic assessment instrument, were necessary at the time of the evaluation and based on the available information I had. However, it is also my opinion that based on the totality of the available information available to me at the time of writing this report, there was sufficient information to complete this report.

**The examiner's opinions as to diagnosis, prognosis [18 U.S.C. § 4247 (c)(4)]**

The following diagnosis is offered in accordance with the criteria set forth in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR):*

**DSM-5-TR Diagnosis:**
Other specified personality disorder

*Other Specified Personality Disorder*
The category of other specified personality disorder, per the DSM-5-TR, applies to presentations in which traits characteristic of a personality disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning, predominate but do not meet the full criteria for any of the disorders in the personality disorders diagnostic class. The other specified personality disorder category is used when the specific reasons a person does not meet criteria for one personality disorder are communicated. Because the defendant declined to sign releases of information for any collateral records and consistently declined to participate in the evaluation while at MCC Chicago, there is limited information about his functioning. However, the available information from collateral sources, his telephone calls, and behavioral observations made by myself and others while he was at MCC Chicago, suggest the presence of some symptoms of several personality disorders.

Specifically, the defendant appeared to be deceitful, as evidenced by intentionally avoiding engaging in the present evaluation. That is, he made several statements in telephone calls attempting to conceal the content of his discussions and speaking with family members about how he should approach the evaluation at Englewood and at MCC Chicago. Additionally, he told me that he could not speak to me without his attorney but then refused to speak to his attorney; suggesting a volitional and intentional decision to not participate in the evaluation. The defendant also exhibited a lack of remorse and consistent irresponsibility, as evidenced by his indifference to the alleged offenses and statements on his telephone calls that he believed he would be returning home after the evaluation. Further, the defendant exhibited somewhat eccentric behavior, which could suggest the presence of schizoid or schizotypal personality disorder. However, there is insufficient data to support either diagnosis or the diagnosis of an antisocial personality disorder at this time, due to lack of available data from his developmental period. Finally, another factor to consider in the assignment of a personality disorder versus other potential diagnoses is whether the person's presentation occurs during the course of either a major mood disorder or primary psychotic disorder. Based on the totality of the available information at this time, the defendant's presentation and symptoms have not occurred during the course of either a major mood disorder or primary psychotic disorder, as neither illness is present. Therefore, a diagnosis of Other Specified Personality Disorder is assigned at this time.

**Additional Conditions or Problems That May Be a Focus of Clinical Attention**

*Malingering*

Per the DSM-5-TR, the essential feature of malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs. Malingering should be strongly considered if any combination of the following is noted:

1. Medicolegal context of presentation (e.g., the individual is referred by an attorney to the clinician for examination, or the individual self-refers while litigation or criminal charges are pending).
2. Marked discrepancy between the individual's claimed stress or disability and the objective findings and observations.
3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen.
4. The presence of antisocial personality disorder.

In this case, three of the four features of malingering are noted. Although I was unable to administer a competency specific instrument with the defendant, the defendant has had two previous competency evaluations and, in my opinion, there is sufficient collateral information (i.e., behavioral observations, phone calls, previous documented

reports and evaluations) to support that the defendant is malingering competency specific deficits and cognitive impairment with regard to his presentation. Specifically, it is my opinion that the defendant is intentionally presenting in a manner to appear to lack any competency related knowledge and ability to assist defense counsel. As described in the sections above, the defendant participated in the evaluation conducted by Dr. Micono with the exception of the competency specific inquiry. Further, Dr. Micono noted a telephone call the defendant made on March 21, 2023 at approximately 11:08PM during which he discussed having another evaluation session, reported completing an assessment with "drawings," and then stated the following:

> "They wanted to do all the court questions... I didn't do it... I just said I have to talk to my lawyer, I said before the questions, I have to talk to him... she said I could schedule something on the computer... or there's a phone here, but they said it's only for the people here... it was weird, they said you answer the ones you know and if you don't know you answer the best... she said just guess your best... I'm not sure if it was a trick or something... so I didn't do it."

Further, the defendant does not appear to meet criteria for a cognitive disorder, intellectual disability (now identified as Intellectual Developmental Disorder in the DSM-5-TR), or have a memory impairment that would account for his frequent statements that he did not know the answers to questions. Individuals with intellectual disabilities often express knowledge of information that they do not know, are less likely to inquire about the correct answers, are able to learn and retain information within brief time periods, and they often have more concrete and simplified responses. Of note, the above listed diagnosis (Other Specified Personality Disorder) and additional conditions of concern (Malingering) are not considered to be mental illnesses. That is, malingering is a response style, and is noted for the defendant at this time to account for his manner of responding and effort regarding his understanding of the legal system.

*Diagnoses Not Assigned and Data that May be Inconsistent with Opinions*
Per Dr. Micono's report, she noted a rule out diagnosis of Autism Spectrum Disorder, Level 1. I considered the possibility of the presence of this diagnosis, but have not assigned them, as it is my opinion that the defendant's presentation during the present evaluation and as documented during Dr. Micono's evaluation is inconsistent with an individual with Autism Spectrum Disorder, Intellectual Developmental Disorder (i.e., Intellectual Disability), or any other neurodevelopmental disorder. That is, the defendant discussed and followed through with plans to not participate in the present evaluation, which requires cognitive functioning and flexibility that would be inconsistent with an individual who has an intellectual disability. The defendant does exhibit some characteristics that may suggest the presence of Autism Spectrum Disorder, specifically, he exhibited restricted patterns of interests (i.e., discussing Bible verses, speaking to his attorney about food at irrelevant times, etc.). However, the

defendant did not appear to exhibit restricted and repetitive patterns of behavior, interests, or activities as manifested by stereotyped movement, inflexible adherence to routines or ritualized patterns, highly restricted, fixated interests, or hyper or hypo reactivity to sensory input to the extent that it caused interference with his daily functioning. Rather, it appeared the defendant's repetitive and restrictive behavior was primarily focused on what appeared to be intentional attempts to avoid engaging with staff members, the treatment program, and with the evaluation. An individual with Autism Spectrum Disorder may often engage in repetitive and restrictive behaviors despite a desire not to do so in some situations. Additionally, the defendant did not repeat Bible verses to me when I attempted to meet with him. Rather, he specifically stated that he could not speak to me without his attorney or without speaking to his attorney first, which suggests a level of awareness of my role as an evaluator and his understanding of the role of a defense attorney. Despite not communicating with his defense attorney during the present evaluation period, the defendant has communicated with defense counsel, to some extent, in the past. This ability to communicate suggests that the defendant has the capacity to communicate with defense counsel when he chooses to do so. To my knowledge, the defendant has not had a traumatic brain injury nor has there been any other known reason to account for a change in the defendant's capacities from previous evaluations, both of which also indicated the possibility of malingering due to his presentation and response style.

Although there is some data suggesting cognitive deficits, there is insufficient data to support the presence of an Intellectual Developmental Disorder, Autism Spectrum Disorder, or other neurodevelopmental disorder. The defendant has reportedly completed a doctoral degree, previously participated in evaluations, declined to answer questions or participate in interviews with me after he was informed the evaluation was related to his legal case. The defendant was also routinely reading and quoting Bible verses throughout the evaluation period at MCC Chicago. It is highly unlikely that an individual with an Intellectual Developmental Disorder would be able to engage in these activities and function independently in a new, although structured, environment. It is my opinion that although the defendant declined to participate in interviews during the present evaluation, that the defendant's presentation over the course of the evaluation period and as documented in previous evaluations is inconsistent with the typical presentation of an individual with an intellectual developmental disorder, neurocognitive disorder, or a neurodevelopmental disorder. Further, it is my opinion that the defendant's presentation appears to be best explained by his choosing not to demonstrate his true knowledge of the legal system after he was informed about the purpose of the evaluation during the forensic intake I conducted. Therefore, based on the totality of the available information, it is my opinion that the defendant's presentation appears to be best explained by an intentional effort to appear to be impaired and unable to understand the proceedings and work with defense counsel.

**Prognosis**: Based on the totality of the available information at this time, the defendant's prognosis as it pertains to his mental health is determined to be stable. The defendant does not currently present with a mental illness that would require inpatient psychiatric hospitalization or intervention.

Regarding the prognosis pertaining to the defendant's ability to understand the proceedings and assist defense counsel, his prognosis is considered to be stable and that he should be able to understand the proceedings and assist defense counsel should he choose to do so. Further, as discussed above, the defendant has the capacity to understand the proceedings and assist defense counsel, and to my knowledge, there is no plausible explanation as to why that would have changed nor is there a mental illness to my knowledge that would account for the defendant's presentation across evaluations and during the present evaluation period. It is my opinion that the defendant's presentation and refusal to speak to defense counsel is intentional and volitional and not due to a mental illness, as it is my opinion he does not meet criteria for a mental illness. It is my opinion based on the totality of the available information, that should the defendant choose to do so, he has the capacity to understand the proceedings and properly assist defense counsel.

**If the examination is ordered under Section 4241, whether the person is suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense [18 U.S.C. § 4247 (c)(4)(A)]**

In accordance with Title 18, U.S.C., §§ 4241 and 4247, it is my opinion that the defendant is not currently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings or to assist properly in his defense.

Respectfully submitted,

Y. Abdelaal, Psy.D.
Forensic Psychologist
MCC Chicago