# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES OF AMERICA

VS.                                    CASE NO: 6:22-cr-201-WWB-LHP

JOSHUA EDWARDS

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

This case is before the undersigned regarding the competency of Defendant Joshua Edwards. For the reasons explained below, the undersigned **RESPECTFULLY RECOMMENDS** the Court find that the United States has established, by a preponderance of the evidence, that Joshua Edwards' competency has been restored and he is presently competent to stand trial.

## I.    PROCEDURAL BACKGROUND

On December 7, 2022, a grand jury returned an indictment charging Joshua Edwards with one count of conspiracy to commit bank fraud, one count of bank fraud, one count of making a false statement to a lending institution, and one count of visa fraud, in violation of 18 U.S.C. § 1349, 18 U.S.C. § 1344, 18 U.S.C. §§ 1014 and 2, and 18 U.S.C. § 1546(a), respectively.  Doc. No. 1.[1]  Joshua Edwards was

_____

[1] Joshua Edward was charged along with his father, Evan Edwards.  Doc. No. 1.

arrested on December 14, 2022, and an initial appearance proceeding pursuant to Fed. R. Crim. P. 5 was conducted before United States Magistrate Judge David A. Baker that same day.    Doc. Nos. 9, 11.

During the course of the Rule 5 proceedings, Magistrate Judge Baker determined there was a question as to Joshua Edwards' mental competency to proceed.    Doc. Nos. 9, 14.    In particular, concerns were raised by Attorney Charles E. Taylor, Jr. about his ability to communicate with Joshua Edwards, and Joshua Edwards either was unwilling or unable to respond to any of Magistrate Judge Baker's questions.    *Id.*    Accordingly, Magistrate Judge Baker continued the Rule 5 proceedings, provisionally appointed Attorney Taylor to represent Joshua Edwards pursuant to the Criminal Justice Act, and ordered Joshua Edwards temporarily detained and committed to the custody of the United States Marshal.    Doc. Nos. 9, 14, 16, 19.    Magistrate Judge Baker also appointed Dr. Jeffrey A. Danziger, a board-certified psychiatrist, to examine Joshua Edwards to determine whether he was competent to proceed, and to submit a report on the matter on or before January 30, 2023.    Doc. No. 19; *see also* 18 U.S.C. §§ 4241, 4247(b), (c).[2]

---

On November 1, 2024 following extensive proceedings under 18 U.S.C. §§ 4241 and 4247, the undersigned found Evan Edwards incompetent to proceed, and that his chances for restoration of competency in the foreseeable future were low.    *See* Doc. No. 238 (citing 18 U.S.C. § 4241(d)).

[2]  Prior to Dr. Danziger submitting his report, Magistrate Judge Baker held a status conference with counsel on December 21, 2022, but no updates were provided other than Joshua Edwards had not yet met with Dr. Danziger.    Doc. Nos. 27, 29.    A second status

Dr. Danziger submitted his report on February 2, 2023. Doc. No. 70 (sealed);[3] *see also* Doc. Nos. 63-64, 67. As set forth in his report, Dr. Danziger attempted to meet with Joshua Edwards on February 2, 2023 at the Orange County Jail. Doc. No. 70, at 1. Dr. Danziger found Joshua Edwards' presentation during the interview as suggestive of feigning, diagnosed him as "Probable Malingering,"[4] and opined that Joshua Edwards was not truly suffering from any mental disease or defect that would render him incompetent to proceed. *Id.*, at 2-4.

Based on this report, the undersigned scheduled a status conference for February 13, 2023. Doc. No. 68. At the status hearing, counsel for Joshua Edwards objected to the report and requested a second competency evaluation. Doc. Nos. 69, 71. With the agreement of counsel for both sides, the undersigned thereafter committed Joshua Edwards to the custody of the Attorney General for a 30-day period for evaluation and preparation of a psychiatric or psychological

---

conference was scheduled for December 27, 2022, but was canceled. Doc. Nos. 28, 31.

[3] While the competency reports from Dr. Danziger and the other experts discussed in this report were initially filed under seal, they were each admitted on the public record during the public competency hearing on July 10, 2024. Doc. Nos. 209, 213, 215. They are also discussed in detail in the parties pre-and-post-hearing briefing, which is also filed on the public docket. *See* Doc. Nos. 205, 208, 218-219. Thus, the undersigned also discusses in detail these various reports and exhibits throughout this report and recommendation.

[4] Malingering is defined as "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs." DSM-5-TR, at 835.

report assessing whether Joshua Edwards was competent to proceed.   Doc. No. 72; *see also* 18 U.S.C. §§ 4242(b), 4247(b), (c).

On April 17, 2023, Dr. Jessica Micono, Psy. D., ABPP, a board-certified forensic psychologist employed by the Bureau of Prisons, issued a forensic evaluation as to Joshua Edwards.   Doc. No. 94 (sealed).   Dr. Micono found Joshua Edwards to exhibit possible signs of malingering and the possible presence of Autism Spectrum Disorder ("ASD").   *Id.*, at 13-15.   Dr. Micono then offered a "tentative opinion that Mr. Edwards is not currently competent to proceed," and that his prognosis for restoration was unclear.   *Id.*, at 16.

The undersigned thereafter held a status conference with counsel on April 28, 2023.   Doc. Nos. 95-96.   During the status conference no objections were raised as to Dr. Micono's report, and both sides agreed that Joshua Edwards should be committed to the custody of the Attorney General for restoration purposes.   Doc. No. 96.   Accordingly, the undersigned ordered Joshua Edwards committed to the custody of the Attorney General to be hospitalized in a suitable treatment facility for a reasonable period of time not to exceed four months, as was necessary to determine whether there was a substantial probability that in the foreseeable future he would attain the capacity to permit the proceedings to go forward.   Doc. No. 97; *see also* 18 U.S.C. § 4241(d)(1).

On January 25, 2024, Dr. Yasmeen Abdelaal, Psy. D., a forensic psychologist employed by the Bureau of Prisons, issued a forensic evaluation as to Joshua Edwards.    Doc. No. 121 (sealed); *see also* Doc. Nos. 119-20.    Dr. Abdelaal diagnosed Joshua Edwards with Other Specified Personality Disorder and Malingering, and found that he did not present with ASD or any other intellectual developmental disorder or neurodevelopmental disorder.    Doc. No. 121, at 16-19. Dr. Abdelaal then opined that Joshua Edwards was competent to proceed to trial. *Id.* at 20.    On January 29, 2024, the Bureau of Prisons issued a Certificate of Restoration of Competency to Stand Trial.    Doc. No. 123 (sealed).

The undersigned held another status conference with counsel on February 8, 2024.    Doc. Nos. 122, 124.    During the status conference, counsel for Joshua Edwards stated that he intended to contest the findings from Dr. Abdelaal's report, and requested time to retain an expert to evaluate Joshua Edwards and prepare and file a report with the Court.    Doc. No. 124.    The undersigned granted that request and scheduled an in-person competency hearing for April 24, 2024.    Doc. No. 125.

On February 14, 2024, Attorney Charles Taylor moved to withdraw as counsel, and following a hearing at which Joshua Edwards was present, the undersigned granted the motion and appointed Attorney Andrew Searle to represent Joshua Edwards.    Doc. Nos. 128-31.    During that hearing, the undersigned was able to converse with Joshua Edwards, and while he

communicated in a childlike fashion, he appeared to understand the undersigned's questions and statements, and he responded to the undersigned's questions.[5]

On April 2, 2024, Attorney Searle moved to withdraw as counsel, which the undersigned denied following a hearing on April 8, 2024 with counsel for all parties and Joshua Edwards present.  Doc. Nos. 146-47, 150-51.  During that hearing, a large portion of which was conducted *in camara*, the undersigned attempted to communicate with Joshua Edwards, who at first appeared responsive, but then became non-responsive after the undersigned engaged in a discussion with Attorney Searle.  Based on the undersigned's discussion with counsel during the April 8, 2024 hearing, the undersigned continued the competency hearing to May 29, 2024.  Doc. No. 151.  The undersigned continued the hearing again on unopposed motion of the United States to June 3, 2024.  Doc. No. 172; *see also* Doc. Nos. 158-59, 163.

On May 15, 2024, Joshua Edwards filed a memorandum from his retained expert, Dr. Randy K. Otto, Ph.D., ABPP, a licensed psychologist.  Doc No. 178-1 (sealed).  In his memorandum, Dr. Otto explained that he was unable to prepare a

---

[5] The undersigned also directed the parties to file a joint notice as to whether, given the Certificate of Restoration to Competency, the undersigned could now proceed with all remaining Fed. R. Crim. P. Rule 5 and 11 proceedings, including a detention hearing.  Doc. No. 132.  Upon consideration of the parties' filings, Doc. Nos. 133-35, the undersigned denied without prejudice Joshua Edwards' request to be released from custody.  Doc. No. 137.

forensic evaluation report for Joshua Edwards because he refused to meet with Dr. Otto or to participate in any evaluation, and the materials Dr. Otto previously received were insufficient to form any opinion about Joshua Edwards' competency. *Id.* Based on Dr. Otto's memorandum, Joshua Edwards' counsel requested a status conference to discuss his ability to obtain an expert for the upcoming competency hearing. Doc. No. 179. In that motion, counsel further stated that he would not be relying on Dr. Melvin Pagan-Gonzalez, an expert retained by Joshua Edwards' prior counsel. *Id.*, at 4.

The undersigned held a status conference on May 17, 2024, a portion of which was held *in camera*. Doc. Nos. 179, 182-86. Joshua Edwards was present, but either was unwilling or unable to communicate with or respond to any of the undersigned's questioning. Based on the undersigned's discussion with counsel at the status conference, the undersigned again continued the competency hearing to July 10, 2024. Doc. No. 187. The undersigned thereafter directed Dr. Otto to conduct a competency evaluation of Joshua Edwards on May 28, 2024, to take place in a secure room at the United States Marshal's Office at the United States Courthouse. Doc. No. 189. On the May 28, 2024 deadline, counsel for Joshua Edwards filed a notice stating that despite the best efforts of both counsel and Dr. Otto, the evaluation of Joshua Edwards could not be completed, and as a result, Dr. Otto would not be rendering an opinion as to Joshua Edwards' competency. Doc.

No. 201.   Counsel further stated that he would not be relying on any retained defense experts at the competency hearing.   *Id.*, at 2-3.

The competency hearing took place on July 10, 2024.   Doc. No. 209; *see also* Doc. No. 215.   During the hearing two witnesses testified for the United States: Dr. Abdelaal and United States Secret Service Task Force Officer Javier Mondejar. *Id.*; *see also* Doc. No. 206.   The United States also admitted, without objection, 14 exhibits, which included multiple video, podcast, and telephone recordings.   Doc. Nos. 213-1 through 213-14.   Joshua Edwards did not submit any exhibits or call any witnesses.   Doc. Nos. 209, 215.   The parties also submitted pre-and-post-hearing briefing.   Doc. Nos. 205, 208, 218-19.   The undersigned has considered all of the exhibits and witness testimony.   This Report and Recommendation follows.

## II.   LEGAL STANDARD

"A defendant has a due process right not to be tried or convicted while incompetent."   *United States v. Ramirez*, 491 F. App'x 65, 71 (11th Cir. 2012)[6] (citing *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975)).   The federal competency standard is set forth in 18 U.S.C. § 4241, which provides:

> If, after [a] hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings

---

[6] Unpublished opinions of the Eleventh Circuit are cited as persuasive authority. *See* 11th Cir. R. 36–2.

against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General.

18 U.S.C. § 4241(d).

Section 4241 codifies the standard for competency set forth by the United States Supreme Court in *Dusky v. United States*, 362 U.S. 402 (1960): "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *See also United States v. Bradley*, 644 F.3d 1213, 1268 (11th Cir. 2011) (quoting *United States v. Hogan*, 986 F.2d 1364, 1371 (11th Cir. 1993)). "The standard for competence to plead guilty is the same as the standard for competence to stand trial." *United States v. Rigsby*, 791 F. App'x 94, 95 (11th Cir. 2019).

During the initial competency proceedings, the burden of proof rested with Joshua Edwards to establish incompetency, and it does not appear that the parties raised any argument on this point. *See Bradley*, 644 F.3d at 1268 (citing *Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995) (stating that a party raising a substantive claim of incompetency must demonstrate his incompetence by a preponderance of the evidence). *See also United States v. Chandler*, No. 6:19-cr-137-Orl-18LRH, 2020 WL 2735917, at *3 (M.D. Fla. May 5, 2020). However, we are now at the restoration stage, and Joshua Edwards contends that the burden of proof rests with the United States. Doc. No. 205, at 6; Doc. No. 219, at 10-11.

While not conceding the issue, the United States recognizes that persuasive authority exists suggesting that the burden of proof to establish restoration of competency rests with the United States.   Doc. No. 218, at 7-8.   *See United States v. Cabrera*, No. 07-20760-CR, 2008 WL 2374234, at *6 (S.D. Fla. June 6, 2008) ("[I]f there is an adjudication of incompetency, and the defendant is committed to the Attorney General . . . the burden of persuasion shifts; *i.e.*, the court must find by a preponderance of the evidence that the defendant has recovered to such an extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense."); *see also United States v. Madison*, No. 6:17-cr-15-Orl-37LRH, 2020 WL 8461574, at *3 (M.D. Fla. Oct. 29, 2020), *report and recommendation adopted*, 2020 WL 7768460 (M.D. Fla. Dec. 30, 2020), *aff'd*, No. 21-12611, 2022 WL 4298175 (11th Cir. Sept. 19, 2022) (in contested competency restoration proceedings, United States conceded that the burden of proof rested with the United States).   Given this persuasive authority, the undersigned finds that the burden of proof rests with the United States to establish by a preponderance of the evidence that Joshua Edwards' competency has been restored.   *See, e.g.*, *United States v. Spear, No.* 1:13-CR-00432-WBH-JSA, 2016 WL 11248531, at *6 (N.D. Ga. Dec. 7, 2016), *report and recommendation adopted*, 2017 WL 695072 (N.D. Ga. Feb. 22, 2017) (assuming that the burden of proof rests with the United States in

restoration proceedings given the lack of clear authority and the United States' failure to specifically address the issue).

The parties dispute whether Joshua Edwards suffers from any mental disease or defect. Regardless, "[n]ot every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Medina*, 59 F.3d at 1107 (quoting *Card v. Singletary*, 981 F.2d 481, 487–88 (11th Cir. 1992)). "Similarly, neither low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial." *Id.* (citing *McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976)). "Incompetency to stand trial is not defined in terms of mental illness. As such, a defendant can be competent to stand trial despite being mentally ill and similarly a defendant can be found incompetent to stand trial without being mentally ill." *United States v. Williams*, No. 5:06-cr-36-Oc-10GRJ, 2007 WL 1655371, at *5 (M.D. Fla. June 7, 2007) (internal citations, footnote, quotation marks, and alterations omitted).

As one district court stated:

> The determination of whether a defendant is mentally competent to stand trial is a question left to the sound discretion of the district court, with the advice of psychiatrists [or other mental health professionals]. The medical opinion of experts as to the competency of a defendant to stand trial is not binding on the court, since the law imposes the duty and responsibility for making the ultimate decision of such a legal question on the court and not upon medical experts.

*United States v. Abernathy*, No. 08-20103, 2009 WL 982794, at *3 (E.D. Mich. Apr. 13, 2009) (alteration in original) (quoting Fed. Proc. § 22:549, *Hearing & Determination as to Competency*; *United States v. Davis*, 365 F.2d 251, 256 (6th Cir. 1966)).    Moreover, when "faced with diametrically opposite expert testimony, a district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion."   *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005) (citations and internal quotations omitted).   "Absent a showing that an evaluation by an expert was professionally inadequate, a court does not err by relying on an expert's report."   *United States v. Deruiter*, 2:14-cr-46-FtM-38MRM, 2017 WL 3308967, at *3 (M.D. Fla. Aug. 3, 2017) (citing *Bradley*, 644 F.3d at 1268).

### III.    SUMMARY OF THE EVIDENCE PRESENTED AT THE JULY 10, 2024 HEARING[7]

A.    *Dr. Jeffrey Danziger, M.D.*

The first expert to examine Joshua Edwards was Dr. Jeffrey Danziger, M.D., a board-certified psychiatrist in the areas of forensic, geriatric, and addiction psychiatry.   Doc. No. 213-4.   Dr. Danziger did not testify, but the United States submitted his report without objection.   Tr. 6.

---

[7] Given the lengthy procedural history of this case, the undersigned discusses the expert reports and testimony in chronological order, rather than the order they were presented during the hearing.   In addition, the transcript of the July 10, 2024 competency hearing is available at Doc. No. 215, and will be cited as (Tr., [page #]).

Dr. Danziger interviewed Joshua Edwards on February 2, 2023 at the Orange County Jail.   Doc. No. 213-4, at 1.   Dr. Danziger was not provided with any outside medical or mental health records; rather he was only provided a newspaper article from the Daytona News Journal concerning the legal charges, and the jail medical records file, which did not disclose any evaluations or treatment of Joshua Edwards by any jail health staff.   *Id.*, at 1-2. Dr. Danziger also spoke with corrections staff familiar with Joshua Edwards.   *Id.* at 1.

Dr. Danziger noted that during the interview, Joshua Edwards presented with "a very childlike demeanor," and was unable to provide "even the simplest of historical information."   Doc. No. 213-4, at 2.   Joshua Edwards could not provide his age, date of birth, the names of his parents, or his address, and could not give any information about his upbringing, background, or current detention.   *Id.* Regardless of the question posed, Joshua Edwards responded "mom and dad help me," or "mom and dad give me special bread."   *Id.*

Dr. Danziger attempted to administer tests for malingering and feigning, such as the Inventory of Legal Knowledge ("ILK") and the Miller Forensic Assessment of Symptoms Test, but Joshua Edwards did not cooperate and did not answer any questions.   Doc. No. 213-4, at 2-3.   Dr. Danziger also attempted to administer the "coin in the hand test," which is a "ridiculously easy" test used to identify persons feigning cognitive impairment; however, Joshua Edwards was

uncooperative and simply replied to any questions "mom and dad help me." *Id.,* at 3.

Dr. Danziger opined that Joshua Edwards' responses, if credited, suggested that he is suffering from "severe cognitive impairment" to the extent that he would likely require 24/7 supervision, would be unable to handle basic activities of daily living, and might require placement in a long-term residential facility. *Id.* However, there was no data to support a finding of such profound intellectual deficits. *Id.* Moreover, the corrections officers who spoke with Dr. Danziger stated that while Joshua Edwards generally acts in a childlike fashion, he seemed at times to be functioning at a higher level, and fellow inmates reported to officers that Joshua Edwards was faking. *Id.* For example, Joshua Edwards was able to correctly respond to officers that he understood the shower and hygiene schedule at Orange County Jail and was able to cooperate and follow all of the rules and requirements of the jail dormitory. *Id.*

Based on this information, Dr. Danziger diagnosed Joshua Edwards as "Probable Malingering," and that it was "more likely than not" that Joshua Edwards was feigning severe cognitive impairment in light of his facing significant federal charges. *Id.,* at 3-4. Accordingly, Dr. Danziger concluded that Joshua Edwards was not truly suffering from any mental disease or defect that would

render him legally incompetent, although he would be willing to revisit his opinion
if any school, disability, social security, or other records were presented.   *Id.*, at 4.

  B. *Dr. Jessica Micono, Psy.D., ABPP*

  The second expert to examine Joshua Edwards was Dr. Jessica Micono, a
licensed clinical psychologist board-certified in forensic psychology and employed
by the Federal Bureau of Prisons, Federal Detention Center, Englewood, Colorado
("FDC Englewood").   Doc. No. 213-5.   Dr. Micono also did not testify, but the
United States submitted her April 17, 2023 report without objection.   Tr., 6.

  Dr. Micono was assigned to evaluate Joshua Edwards over a 30-day period
pursuant to 18 U.S.C. § 4247(b).   *See* Doc. No. 72.   Upon his arrival at FDC
Englewood, Joshua Edwards met with a pre-doctoral psychology intern who
explained the nature of the evaluation, that confidentiality did not exist, that a
report would be prepared and provided to the Court and to counsel for both sides,
and that Dr. Micono could be subpoenaed to testify.   Doc. No. 213-5, at 1.   Joshua
Edwards responded that he understood this information, and that he was aware a
mental health evaluation had been ordered.   *Id.*   Joshua Edwards also understood
that he could be sent to a federal medical center for four months for treatment if
found incompetent.   *Id.*, at 7.

  Dr. Micono saw Joshua Edwards for formal evaluation sessions on March 15,
2023 (one hour and 20 minutes), on March 21, 2023 (one hour and 30 minutes),

March 22, 2023 (two hours), and on April 3, 2023 (one hour and 30 minutes session and a separate 15-minute session).    Doc. No. 213-5, at 2.    A pre-doctoral psychology intern under Dr. Micono's supervision also conducted a 15-minute initial screening on March 3, 2023, and administered psychological testing on March 28, 2023 (one hour and 30 minutes) and on March 29, 2023 (30 minutes).    *Id.*    The Weschsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), the Validity Indicator Profile ("VIP"), and the ILK were administered to Joshua Edwards; the Revised Competency Assessment ("R-CAI") was attempted, but he declined to participate.    *Id.*, at 1-2.    Dr. Micono also reviewed recordings of some of the phone calls Joshua Edwards made while at FDC Englewood, as well as the indictment, warrant affidavit, a PowerPoint case summary, letters from Aslan International describing Joshua Edwards' job duties and titles, publicly available Facebook videos and podcast recordings, and Dr. Danziger's February 2, 2023 report.    *Id.*

During her meetings with Joshua Edwards, Dr. Micono was able to elicit some background history.    Joshua Edwards explained that he was born on April 26, 1992 in Alberta, Canada, that he has an older sister, that he was living with his parents and sister at the time of his arrest, and that he went to school when he was "older."    Doc. No. 213-5, at 3.    Joshua Edwards was unsure if he ever lived alone, did not know where his sister lived, and could not remember the name of his school. *Id.*    He reported he was close with his parents and sister, spoke with his mother

regularly, and was able to report that his father was "taken" and is sick, but was unable to say whether his father was in jail.   *Id.*   Joshua Edwards stated he never dated, was never in any romantic relationships, and never married or had children. *Id.*  He also reported that he did "really good" in school and never attended any special education classes, but could not recall when he graduated from high school. *Id.*  Joshua Edwards further stated that he attended schooling to study the Bible and become a preacher, and Dr. Micono confirmed he received a Doctor of Practical Ministry from Wagner Leadership Institute, an unaccredited institution.   *Id.*, at 4.

Joshua Edwards reported no employment, criminal, mental health, medical, or substance abuse history, and declined to answer questions about his sexual history or childhood abuse history, and Dr. Micono did not receive any records on these topics.   Doc. No. 213-5, at 4, 10.   However, Dr. Micono did note that in letters dated April 21, 2018 from Aslan International, Joshua Edwards was listed as the "Technological Operations Manager" for four years, that he managed four employees and three volunteers, supervised the day to day operations media team, recruited and hired for media programs, performed financial management of media programs, and ran the ASLAN International Association Studio.  *Id.*, at 4-5.   Dr. Micono also observed several videos and podcast episodes on Joshua Edwards' Facebook page, in which he was giving sermons and discussing Bible verses.  *Id.*, at 5.   Dr. Micono noted that in those videos and podcasts, Joshua Edwards did not

speak in a childlike voice, but appeared to be reading off of a cue card; his speech was stilted and halting and had a flat affect.   *Id.*

Dr. Micono, either directly or through FDC Englewood staff, made several observations about Joshua Edwards' mental status and behavior.   Doc. No. 213-5, at 6-8.   Joshua Edwards never reported any history of mental health issues or treatment, and maintained that he had no mental health concerns during the evaluation period.   *Id.*, at 6-7.   He was able to remember that he had previously been in protective custody, and was worried whether he would be safe at FDC Englewood and if he needed "street smarts." *Id.*, at 6.   While Joshua Edwards reported that he could not read or write, he was able to read aloud test instructions and read and demonstrate comprehension of a confidentiality disclosure.   *Id.*, at 6-7.

Throughout his stay at FDC Englewood, Joshua Edwards was alert and oriented to person, place, time, and situation; his speech was logical, coherent, and goal-directed, although he spoke in a childlike manner; and he did not present with any signs of hallucinations or delusional ideation.   Doc. No. 213-5, at 6-7.   He was in the open housing unit in the general population for the duration of his evaluation period, without issue.   *Id.*   He did not exhibit signs of significant cognitive or memory problems with regard to daily functioning in the housing unit, and was able to recall inmates' names, to recall staff and their roles, and was able to comply

with the schedule and learn the rules and routines on the housing unit.   *Id.*, at 7. Joshua Edwards was also able to make regular phone calls and navigate the phone system – which involved accessing a computer system, entering names and phone numbers, using an access code, and repeating a set phrase – without any difficulties. *Id.*   He would occasionally interact with other inmates, but frequently spent time in his cell reading.   *Id.*

Joshua Edwards spoke using a childlike voice to housing staff, and at times would use both basic vocabulary and more complex words.   Doc. No. 213-5, at 6, 7.   For example, he correctly used the words "assurance" and "confidentiality" during his evaluations with Dr. Micono, but at other times would be unable to answer questions.   *Id.*, at 6.   Joshua Edwards was at times difficult to redirect and would make repetitive statements during sessions, although his emotional affect was appropriate to context.   *Id.*

Dr. Micono also summarized some of the phone calls between Joshua Edwards and his mother and sister.   Doc. No. 213-5, at 8-10.   Based on her review of those calls, Dr. Micono found Joshua Edwards to be alert and oriented to person, place, time, and situation; he did not present any confusion as to why he was at FDC Englewood; and he demonstrated adequate memory for previous events and conversations.   *Id.*, at 10.   However, Joshua Edwards spoke in a childlike manner and was repetitive in his questions to his family.   *Id.*   He never mentioned any

mental health symptoms, and expressed significant concerns and indecision about whether or not to answer legally focused questions. *Id.* It was also noted that during some of the phone calls, Joshua Edwards' family would suggest or instruct him to answer questions either "I don't remember," "I don't recall," or that he should not answer the questions or talk without a lawyer. *Id.*, at 8-10, 14.

With regards to testing, Dr. Micono first attempted to administer the ILK, which is used to assess response styles of defendants undergoing evaluations of adjudicative competence, on March 21 2023, but Joshua Edwards stated that he could not answer the questions and needed to speak with his lawyer before answering any questions related to the legal system or his case. Doc. No. 213-5, at 7, 12. On March 22, 2023, the ILK was administered to Joshua Edwards again, with his then-counsel, Attorney Charles Taylor, present via video. *Id.*, at 7-8, 12. The ILK is an untimed true/false test and Joshua Edwards scored 33 out of 61, which suggested that he did not put forth effort in answering the questions and merely guessed. *Id.*, at 12.

Dr. Micono also administered the R-CAI, which is a semi-structured interview used to assess a person's factual and rational understanding of the proceedings and ability to assist in his defense. Doc. No. 213-5, at 8. Dr. Micono was only able to ask the first three questions: (1) identify the charges; (2) identify whether the charges are felonies or misdemeanors; and (3) identify whether felonies

or misdemeanors are more severe. *Id.* Joshua Edwards was unable to answer these questions and was unable to retain any information relating to them despite Dr. Micono providing education on the topics. *Id.* Joshua Edwards then declined to further participate without speaking with his attorney. *Id.*

Dr. Micono also administered to Joshua Edwards the WAIS-IV, which is used to assess cognitive functioning and general thinking and reasoning skills. Doc. No. 213-5, at 11. Joshua Edwards' Verbal Comprehension Index score, which measures a person's ability to understand verbal information, think with words, and express thoughts in words, was 78, which was in the borderline range and above those of 7% of his peers. *Id.* His Perceptual Reasoning Index score, which measures nonverbal reasoning abilities, could not be interpreted because Joshua Edwards demonstrated too much variability on the relevant subtests. *Id.* His Working Memory Index score, which measures an individual's ability to respond to oral stimuli and to hold and manipulate data in one's immediate memory (*i.e.*, attention span), was in the extremely low range (53), higher than only 0.1% of his peers. *Id.* And Joshua Edwards also scored in the extremely low range (53) for his Processing Speed Index, which measures an individual's ability to solve nonverbal problems as quickly as possible. *Id.* Dr. Micono could not obtain a Full Scale IQ, which is

the aggregate of these four Indexes, due to the variability in Joshua Edwards' performance.   *Id.*[8]

Dr. Micono diagnosed Joshua Edwards as "Rule-Out Malingering," and "Rule-Out Autism Spectrum Disorder Level 1."   Doc. No. 213-5, at 13.   Dr. Micono explained that "[i]n this case, rule-out is used to indicate that there is some evidence for the consideration of the diagnosis in question, but not enough evidence to definitively confirm or exclude the diagnosis.   It does not suggest that the diagnosis had been ruled out."   *Id.*   More specifically, Dr. Micono found evidence to suggest some cognitive impairment, particularly with regard to processing speed and working memory, however there was also evidence that Joshua Edwards graduated high school, received a doctorate degree from an unaccredited school, and held a supervisory position for several years (although Dr. Micono noted that the authenticity and accuracy of the Aslan International letters was unknown).   *Id.* And Joshua Edwards' scores on the ILK and general response style towards questions assessing his legal knowledge suggested that he was not putting forth sufficient effort and may have been attempting to present his understanding of legal concepts as significantly worse than it genuinely is.   *Id.*   In particular, Joshua

_____

[8]  Joshua Edwards was also administered the VIP, which assesses how an individual approaches assessment of his cognitive abilities.   *Id.*, at 12.   Joshua Edwards provided valid and compliant responses and made an effort to answer correctly, which also suggested that he put forth adequate effort on the WAIS-IV.   *Id.*   However, the VIP is not timed, and Joshua Edwards took an extended length of time to complete the VIP.   *Id.*

Edwards' reported complete lack of legal knowledge and inability to learn or retain simplistic legal concepts was inconsistent with his presentation, reported history, and functioning throughout his evaluation period and during portions of the WAIS-IV.  *Id.*, at 12-13.  He also presented a clear external incentive to intentionally exaggerate his condition; he faces legal charges carrying a lengthy prison sentence. *Id.*, at 14.  As such, Dr. Micono also noted possibly malingering.  *Id.*, at 13.

Dr. Micono opined that

> while it is possible Mr. Edwards does have some cognitive impairment, his complete lack of knowledge of the legal system is unreasonable.  Additionally, he demonstrated severe memory impairment that was limited to education regarding legal concepts. Over the course of the evaluation period, Mr. Edwards demonstrated no other memory problems, as he recalled, without issue, information discussed during prior sessions.  He additionally demonstrated no signs of memory impairment during phone calls with his family. However, when provided with definitions regarding basic legal terms, he stated he could not recall information provided repeatedly and immediately prior to being asked to recall this information.  Mr. Edwards also reported difficulty recalling some basic historical information which is highly atypical.  Even those with intellectual disabilities or other neurocognitive disorders typically have an ability to remember such information.  Additionally, he did not report experiencing any sort of head injury or other significant medical disorder that would account for such a decline in functioning since the completion of his doctorate degree.

*Id.*, at 14.

Dr. Micono did note, however, that just because Joshua Edwards might be exaggerating, that did not preclude the presence of a genuine mental health problem, and given his odd interpersonal style, his perseverative speech, and his

low IQ scores, Dr. Micono also provided a "rule-out" diagnosis for ASD.   *Id.*, at 14-15.   Dr. Micono based this finding on Joshua Edwards' reported history of difficulties with social interaction (no dating history and few friends), his repetitive speech throughout the evaluation period, and his performance on the WAIS-IV. *Id.*, at 15.   Dr. Micono further noted that the absence of any records to show the presence of any of these symptoms in childhood also factored into the "rule-out" ASD diagnosis.   *Id.*   Nevertheless, Dr. Micono stated that even if ASD was present, that did not automatically equate to a finding of incompetency.   *Id.*

In sum, Dr. Micono opined that there was both evidence "to suggest that [Joshua Edwards] may have a mental disorder (autism spectrum disorder) that is significantly impairing his present ability to understand the nature and consequences of the court proceedings against him and his ability to properly assist in his defense; however, there is also evidence that he has no mental disorder impairing his present abilities."   *Id.*, at 16.   Because no formal assessment of his actual legal knowledge and rational ability to apply this knowledge to his current legal circumstances was possible, and in light of the evidence presented, Dr. Micono offered a "tentative opinion" that Joshua Edwards was not currently competent to proceed.   *Id.*

C.    *Dr. Yasmeen Abdelaal, Psy.D.*

The first witness to testify, and the third expert to evaluate Joshua Edwards, was Dr. Yasmeen Abdelaal, Psy.D., a licensed clinical psychologist.  Tr., 8.  Dr. Abdelaal received her Bachelor of Arts in Psychology from the University of Arkansas, her Master of Arts in Counseling with a Specialization in Forensic Psychology from Adler University, and she received her Doctor of Psychology in Clinical Psychology in July 2020 from the Chicago School of Professional Psychology.   Doc. No. 213-1, at 1; Tr. 9, 32.   From September 2020 to August 2021, Dr. Abdelaal worked as a psychology postdoctoral fellow at the Netcare Forensic Center, and from August 2021 to September 2022 she was employed as a forensic psychologist at the same Center.   Doc. No. 213-1, at 1; Tr. 9-10.[9]

Since September 2022, Dr. Abdelaal has worked as a forensic psychologist at the Federal Bureau of Prisons Metropolitan Correctional Center – Chicago ("MCC Chicago").   Doc. No. 213-1, at 1; Tr., 9, 32.   In that position, Dr. Abdelaal conducts competency evaluations and administers assessments to determine a defendant's competency to stand trial, criminal responsibility, sentencing mitigation, and other psychological topics.   Doc. No. 213-1, at 1; Tr. 32-33.   Dr. Abdelaal also acts as Chief Psychologist on an as-needed basis, has completed numerous specialized

---

[9] The undersigned was provided Dr. Abdelaal's curriculum vitae, Doc. No. 213-1, but was not provided such information for Dr. Danziger or Dr. Micono.

trainings, and has made several presentations and consultations.   Doc. No. 213-1, at 1, 8-11.   During her career to date, Dr. Abdelaal has been involved in approximately 100 to 150 competency matters.   Tr., 11.   Dr. Abdelaal was admitted, without objection, as an expert in psychology and forensic psychology. *Id.*

Dr. Abdelaal was assigned to conduct the forensic evaluation for Joshua Edwards.   Tr., 12.   He arrived at MCC Chicago on August 24, 2023.[10]   *Id.*   Dr. Abdelaal first interacted with Joshua Edwards on August 28, 2023, and he was routinely observed by Dr. Abdelaal, correctional staff members, psychology staff members, and unit team staff members throughout the entirety of his approximately four-month stay.   Doc. No. 213-2, at 2; Tr. 12, 15-16, 52.

In addition to her routine observations and brief interactions with Joshua Edwards, Dr. Abdelaal attempted to interview him on three occasions:   August 28, 2023, November 16, 2023, and December 8, 2023.   Doc. No. 213-2, at 2; Tr., 51-54. The August 28, 2023 interview only lasted approximately 10 minutes, and Joshua Edwards refused to meet with Dr. Abdelaal on the other two dates.   Doc. No. 213-2, at 2, 6; Tr. 52-53.   Dr. Abdelaal also engaged in email communications with the

---

[10] Joshua Edwards participated in a routine health intake screening on August 24, 2023, at which he reported no history of medical or mental health issues and no symptoms of same.   Doc. No. 213-2, at 11-12.   He did not arrive at MCC Chicago with any prescriptions and was not prescribed any medication while at the facility.   *Id.*, at 12.

Assistant United States Attorney Kara Wick, and with Joshua Edward's prior
counsel, Attorney Charles Taylor, and spoke with Attorney Taylor via telephone on
December 19, 2023 and December 28, 2023.   Doc. No. 213-2, at 3.   Dr. Abdelaal
attempted to contact Joshua Edwards' mother and sister on December 28, 2023, but
neither of them returned her call.   *Id.*; Tr., 74.   In addition, Dr. Abdelaal reviewed
several sources of information, to include:   (1) the docket and indictment; (2) the
undersigned's February 13, 2023 Order; (3) the transcript of Joshua Edwards'
December 14, 2022 hearing before Magistrate Judge Baker; (4) a USM-129 Individual
Custody/Detention Report; (5) medical, mental health, and security records from
the BOP; (6) select telephone calls placed by Joshua Edwards while at MCC Chicago;
and (7) Dr. Micono's report.[11]   Doc. No. 213-2, at 2.   *See also* Tr. 13-15, 16-17.
Because Joshua Edwards refused to participate in any testing, assessments, or other
evaluations while at MCC Chicago, Dr. Abdelaal was unable to perform any
additional competency related assessments, and instead relied heavily on Dr.
Micono's report, the observations of Joshua Edwards while at the facility, and the
above-identified external sources.   Doc. No. 213-2, at 4-16; Tr., 54-56.

    During Dr. Abdelaal's August 28, 2023 meeting with Joshua Edwards, she
explained to him the nature and purpose of her evaluation, and provided a

---

[11] Dr. Abdelaal was not provided a copy of Dr. Danziger's report, but did consider
the summary of the report provided by Dr. Micono.   Doc. No. 213-2, at 12-13.

Statement of Understanding form to him.   Doc. No. 213-2, at 3; Tr. 14.   Although

he stated that he was not good at reading and writing, Joshua Edwards was able to

read the form – both out loud and to himself – and asked if he was required to sign

it.   Doc. No. 213-2, at 3; Tr. 14.   However, when Dr. Abdelaal attempted to ask

Joshua Edwards any questions about the form or about the legal system, including

basic questions such as the date, he would answer that his lawyer instructed him

not to sign anything without talking to him, and that he could not answer any

questions without his lawyer.   Doc. No. 213-2, at 3-4, 5-6, 15; Tr. 14, 70-71.   Joshua

Edwards was able to provide his name to Dr. Abdelaal and was able to ask

questions – such as how long the meeting would last, the definition of the term

"forensic," and the types of groups he would be in – but would often interrupt Dr.

Abdelaal and not listen to her explanation before stating that he did not understand.

Doc. No. 213-2, at 5.   He often appeared to be looking around the office and not

listening.   *Id.*

　　While at MCC Chicago, Joshua Edwards was housed in a jail-based

restoration unit and was enrolled in educational competency restoration groups, a

daily morning meeting on the housing unit, and a periodic recreational group.

Doc. No. 213-2, at 6.   He was also enrolled in a Slater Method competency

restoration group due to the rule out ASD diagnosis.   *Id.*   According to MCC

Chicago records, Joshua Edwards refused to participate in the treatment

programming, repeatedly stating that he did not intend to participate in any of the groups and that he would only speak with his lawyer.   *Id.*; Tr., 67-68; *see also* Doc. No. 213-14.   However, Joshua Edwards exhibited a pattern of behavior where he would be out on the unit socializing with inmates and watching television and/or playing board games, but would return to his cell to avoid having contact with treatment staff.   Doc. No. 213-2, at 6-7.   This behavior was relayed to Dr. Abdelaal at her weekly multidisciplinary meetings with correctional services, medical, psychology, and unit team staff members.   *Id.*, at 7.   During those meetings, Dr. Abdelaal was informed that if Joshua Edwards was in a common area before a group started, he would leave prior to the beginning of the meeting, refused to participate or answer any questions, and intentionally avoided the group meetings. *Id.*; *see also* Tr. 18-19.

Dr. Abdelaal also reviewed a select sample of the approximately 871 telephone calls Joshua Edwards made while at MCC Chicago.   Doc. No. 213-2, at 7-9; Tr. 20-25.[12]   Almost all of the calls were made to Joshua Edwards' mother and sister, and for each reviewed telephone call, he appropriately responded to voice prompts, and was aware of the date, the schedule at MCC Chicago, and upcoming

---

[12] Several of the phone calls were made in a different language, and the speakers would switch back and forth between that language and English.   Tr., 24-25.   Dr. Abdelaal was unable to identify the precise language, although she believed a few words were in Arabic.   Tr., 24-25, 62-63.

holidays.    Doc. No. 213-2, at 7-9; Tr., 23.    During the calls, Joshua Edwards routinely discussed his functioning and routines at the housing unit, as well as his allotted telephone minutes each month and how many minutes were left.    Doc. No. 213-2, at 8-9.    His speech was coherent, organized, clear, and goal directed, he responded appropriately and accurately to questions, asked follow-up questions, and exhibited conversational ability, including consoling a family member who was crying on the phone.    *Id.*    Joshua Edwards was able to discuss the differences in FDC Englewood and MCC Chicago, and instructed his family members not to discuss certain information.    *Id.*, at 8.    While nearly all of the calls included discussions of the Bible, his calls from November 2023 through January 2024 were more rapid and only included brief discussion of Bible verses and his functioning and overall well-being.    *Id.*[13]

_____

[13] During the hearing, the United States elicited testimony from Dr. Abdelaal regarding her review of several videos and podcasts from Joshua Edwards' Facebook page. Tr., 25-30.    Dr. Abdelaal admittedly did not review these Facebook posts as part of her evaluation of Joshua Edwards and did not discuss them in her report; rather she reviewed them in preparation for her hearing testimony.    Tr., 25-27.    Joshua Edwards' counsel objected to this testimony as outside the scope of Dr. Abdelaal's report and as improper bolstering.    Tr., 27-28.    The undersigned carried the objection with the case to be addressed in this report and recommendation.    Tr., 29-30.

Upon consideration, and given the lack of argument by the United States in support of considering this testimony, the undersigned will sustain the objection and will not consider Dr. Abdelaal's testimony with respect to the Facebook posts.    However, the Facebook posts themselves have been admitted into evidence without objection, *see* Tr. 6; Doc. No. 213-7, and the undersigned has reviewed and considered those posts as discussed below.

On December 28, 2023, Dr. Abdelaal spoke via telephone with Joshua Edwards' then-counsel, Attorney Charles Taylor, for approximately 51 minutes. Doc. No. 213-2, at 13.   Attorney Taylor expressed concerns about Joshua Edwards' ability to understand questions, that he would respond to questions in an irrelevant manner, and that Joshua Edwards was primarily focused on his father and his father's health issues.   *Id.*; Tr., 50.   Dr. Abdelaal found this to be inconsistent with Joshua Edwards' communication style during his telephone calls with his family, in which he responded to direct questions in a relevant manner.   Doc. No. 213-2, at 13.   Attorney Taylor further relayed that he never informed Joshua Edwards not to participate in the evaluation process and that Joshua Edwards had not contacted him while at MCC Chicago.   *Id.*   Dr. Abdelaal and unit staff encouraged and attempted to coordinate legal calls between Joshua Edwards and his counsel, however each time they offered Joshua Edwards the opportunity to talk to his attorney, he declined.   *Id.*, at 15-16; Tr. 59.   Joshua Edwards also refused to participate in a scheduled call with his attorney on December 8, 2023.   Doc. No. 213-2, at 15-16.

Dr. Abdelaal diagnosed Joshua Edwards with Other Specified Personality Disorder.   Doc. No. 213-2, at 16.   Specifically, Dr. Abdelaal found Joshua Edwards to be deceitful, as evidenced by his deliberate refusal to engage in the evaluation process.   *Id.*, at 17.   He made statements on his telephone calls to family members

in which he attempted to conceal information and discussed how to approach his

evaluations at FDC Englewood and MCC Chicago.  *Id.*  He told Dr. Abdelaal that

he would not speak to her without talking to his attorney, but then refused to talk

to his attorney.  *Id.*  He also exhibited a lack of remorse or responsibility for the

charges against him, but did not exhibit any symptoms of a major mood disorder

or primary psychotic disorder.  *Id.*

Dr. Abdelaal also diagnosed Joshua Edwards as Malingering.   Doc. No. 213-

2, at 17.   In particular, she found Joshua Edwards to be intentionally presenting in

a manner to appear to lack any competency related knowledge and ability to assist

defense counsel; for example, he participated in the evaluation with Dr. Micono but

refused to engage in any competency specific inquiries.  *Id.*, at 18.  He did not

meet the criteria for any cognitive disorders or intellectual disabilities, nor did he

appear to have a memory impairment.  *Id.*  Dr. Abdelaal noted that persons with

intellectual disabilities would often express knowledge of information that they did

not know, were able to learn and retain information within short periods of time,

and gave concrete and simplified responses, whereas Joshua Edwards did not

exhibit these traits.  *Id.*; Tr. 31.

Dr. Abdelaal considered Dr. Micono's rule out diagnosis of ASD, but opined

that Joshua Edwards' behavior was inconsistent with such a diagnosis.   Doc. No.

213-2, at 18.   For example, Dr. Abdelaal noted that Joshua Edwards discussed and

followed through with plans to not participate in the evaluation process at MCC
Chicago, which required cognitive functioning and flexibility inconsistent with
someone with an intellectual disability.  *Id.*  While noting that Joshua Edwards
did exhibit restricted patterns of interest (the Bible and food), which is suggestive
of ASD, he did not exhibit other characteristics of ASD such as stereotyped
movement, inflexible adherence to routines or ritualized patters, highly restricted
and fixated interests, or hyper or hypo reactivity to sensory input to the extent that
it interfered with activities of daily living.  *Id.*, at 18-19; Tr., 56.  Rather, "it
appeared the defendant's repetitive and restrictive behavior was primarily focused
on what appeared to be intentional attempts to avoid engaging with staff members,
the treatment program, and with the evaluation."  Doc. No. 213-2, at 19.  And
Joshua Edwards' refusal to speak with Dr. Abdelaal without first talking to his
attorney suggested a level of awareness of Dr. Abdelaal's role as an evaluator and
of his attorney's role.  *Id.*  Moreover, Joshua Edwards possessed the ability to
communicate and had done so in the past – both with evaluators and with his
defense counsel.  *Id.*

     Dr. Abdelaal further opined:

> Although there is some data suggesting cognitive deficits, there
> is insufficient data to support the presence of an Intellectual
> Developmental Disorder, Autism Spectrum Disorder, or other
> neurodevelopmental disorder. The defendant has reportedly
> completed a doctoral degree, previously participated in evaluations,
> declined to answer questions or participate in interviews with me after

he was informed the evaluation was related to his legal case.  The defendant was also routinely reading and quoting Bible verses throughout the evaluation period at MCC Chicago.  It is highly unlikely that an individual with an Intellectual Developmental Disorder would be able to engage in these activities and function independently in a new, although structured, environment.  It is my opinion that although the defendant declined to participate in interviews during the present evaluation, that the defendant's presentation over the course of the evaluation period and as documented in previous evaluations is inconsistent with the typical presentation of an individual with an intellectual developmental disorder, neurocognitive disorder, or a neurodevelopmental disorder. Further, it is my opinion that the defendant's presentation appears to be best explained by his choosing not to demonstrate his true knowledge of the legal system after he was informed about the purpose of the evaluation during the forensic intake I conducted.  Therefore, based on the totality of the available information, it is my opinion that the defendant's presentation appears to be best explained by an intentional effort to appear to be impaired and unable to understand the proceedings and work with defense counsel.

Doc. No. 213-2, at 19.

Dr. Abdelaal concluded by opining that Joshua Edwards does not meet criteria for a mental illness, has the capacity to understand the proceedings and properly assist defense counsel, and is not currently suffering from a mental disease or defect rendering him mentally incompetent.   Doc. No. 213-2, at 20; Tr. 13.

On cross-examination, Dr. Abdelaal testified that her ultimate opinion in most cases is that a defendant is competent to proceed, and she has only opined that a defendant is incompetent on two or three occasions.  Tr., 35.  Dr. Abdelaal further testified that it is difficult to make an accurate assessment of a person's mental health status if there is a belief that the person is malingering, and that a

person can be suffering both from ASD and malingering at the same time.   Tr. 41-
42.   However, Dr. Abdelaal testified that during her time within the BOP system,
no one within the BOP administration has ever expressed to her or anyone that she
was aware of that a defendant should be discharged in order to make a bed
available for an incoming defendant.   Tr., 45.

With respect to her evaluation of Joshua Edwards, Dr. Abdelaal testified that
she did not receive any investigative reports or materials from the United States and
did not receive or review his pretrial bail report, which counsel argued listed an
informal diagnosis of autism.   Tr., 46, 57.   She further explained that the phone
calls between Joshua Edwards and his mother and sister primarily focused on Bible
verses and prayers, and that it appeared as though his family members were
providing him guidance on how to behave while at MCC Chicago, including
advising Joshua Edwards to be "inconspicuous and quiet."   Tr., 47-49.   Dr.
Abdelaal also acknowledged that incompetent defendants were able to successfully
navigate the phone system at MCC Chicago.   Tr., 59-60.

D.    *Javier Mondejar*

The second and final witness to testify was Javier Mondejar, a criminal
enforcement officer with U.S. Customs and Border Protection ("CBP").   Tr., 77.
Officer Mondejar has been employed by CBP for the past 16 years, and prior to that
role, worked as a law enforcement officer and in the state corrections system.   Tr.,

77-78.   He is also currently assigned as a Task Force Officer with the United States
Secret Service.   Tr., 78.

Officer Mondejar was one of the officers present at the arrest of Joshua
Edwards on December 14, 2022.   *Id.*   The arrest was made at the Edwards' home
in New Smyrna.   *Id.*   Officer Mondejar testified that at the time of his arrest,
Joshua Edwards was located at the left-hand side of the house by the kitchen.   *Id.*
His father, Evan Edwards, was on the right-hand side of the house in a hospital bed.
*Id.*   Joshua Edwards was instructed to move away from the kitchen counters and
place his hands behind his back; he proceeded to do so but resisted and was
handcuffed and escorted outside by Officer Mondejar and another Task Force
Officer without incident.   Tr., 78-79.

Officer Mondejar was able to communicate with Joshua Edwards, who asked
what was going on and if his father was ok.   Tr., 79.   Officer Mondejar was able to
understand and comprehend him.   *Id.*   Officer Mondejar and the other officer read
Joshua Edwards his Miranda warnings, and he responded that he understood and
wanted a lawyer.   *Id.*

Joshua Edwards was subsequently placed in a van with his father for
transport to the United States Courthouse.   Tr., 79-80.   Joshua Edwards was able
to communicate in an intelligible manner and respond appropriately to Officer
Mondejar; he asked what the next procedures would be, and Officer Mondejar

explained that he was being transported to the courthouse for processing by the U.S. Marshals Service and an initial appearance before a judge, at which point he would receive an attorney if he did not have one.   Tr., 80.

At the courthouse, Joshua Edwards complied with all directives and responded appropriately to all questions by the U.S. Marshals Service.   Tr., 81. Officer Mondejar did not observe Joshua Edwards expressing any inability to understand any instructions.   *Id.*   After he was processed, Joshua Edwards was placed in a cell with his father Evan Edwards.   *Id.*   At this point, Officer Mondejar observed Joshua Edwards and his father talking, and at times whispering with each other, but not could not hear what they were saying.   Tr., 82, 88-89.

At all times, Joshua Edwards appeared coherent, and followed instructions without any issues.   Tr., 82-83.   However, this behavior changed several hours later during the initial appearance proceeding, at which Officer Mondejar observed Joshua Edwards looking up at the ceiling, not paying attention, and not acknowledging his mother and sister, his attorney, or the judge.   Tr., 82, 88-89. Officer Mondejar did not observe any events or injuries that would have caused this change in Joshua Edwards' behavior.   Tr., 83.[14]

---

[14] On cross-examination, counsel for Joshua Edwards inquired about a prior arrest of Joshua Edwards in connection with a criminal complaint that was subsequently dismissed.   Tr., 90-96.   The United States objected to this line of questioning as outside the scope of direct examination, and defense counsel argued that the questioning was relevant as it went to Officer Mondejar's credibility, as well as to the possibility that the

*E.*     *Additional Evidentiary Submissions*

In addition to the expert reports and testimony, the United States admitted into evidence without objection several other documents, to include:   (1) various court filings (the Certificate of Competency issued by the Bureau of Prisons, the indictment, the undersigned's February 13, 2023 Order, a transcript from the December 14, 2022 initial appearance, and a defense notice regarding Dr. Otto's attempted evaluation of Joshua Edwards) (Doc. Nos. 213-3, 213-8, 213-11, 213-12); (2) the USM-129 Individual Custody/Detention Report, which listed a possible mental health issue and reported autism (Doc. No. 213-13); and (3) electronic medical, mental health, and security records maintained by the BOP, which detailed, among other things, Joshua Edwards' refusal to meet with and be evaluated by psychologists, psychiatrists, and other staff at the BOP, and his refusal to participate in restoration treatment, (Doc. No. 213-14).   The undersigned has considered each of these exhibits in preparing this report and recommendation.

The United States also admitted without objection copies of four letters each dated April 21, 2018 from Aslan International Ministry, Inc. ("Aslan International") Doc. No. 213-6.   The first letter, signed by Walter Gnida, President of Aslan

---

testimony could show Joshua Edwards' prior experience with the arrest and booking process.   *Id.*   The undersigned reserved ruling on the objection, and upon further consideration, the undersigned now overrules the objection and has given that testimony the weight it is due.

International, appears to be a request to classify Joshua Edwards (identified as Dr. Josh Edwards) as a L1-A non-immigrant transferee to fill a three-year executive level position in the United States, specifically Technological Operations Manager. *Id.*, at 1-6.  The letter describes the purpose of Aslan International, its corporate structure, and its financial goals.  *Id.*  With respect to Joshua Edwards in particular, the letter details that he had been working for the past four years as a Technological Operations Manager in Canada, supervising four employees and three volunteers, recruiting and hiring for media programs, engaging in finance management, and running the Aslan International studio.  *Id.*, at 2, 4.  In the United States, Joshua Edwards would be tasked with supervising the media team, coordinating digital operations, overseeing key recruiting, developing training programs, overseeing the budget process, and integrating technology for long and short terms business plans.  *Id.*, at 3-4.  The letter further described Joshua Edwards as possessing "executive level experience," and "specialized expertise and training skills in media."  *Id.*, at 5.

The second letter, also signed by Walter Gnida, is addressed to Joshua Edwards and contains his job offer for the position of Technology Operations Manager in the United States.  *Id.*, at 7-10.  This job offer, which was effective as of August 12, 2018, details the same job duties described in the first letter, and also contains various terms and conditions of employment, such as salary and fringe

benefits.  *Id.*  The final two letters, also signed by Walter Gnida, consist of an

employment verification letter which again details the same prior job experience

and current/proposed job duties for Joshua Edwards, Doc. No. 213-6, at 11-12, and

an "Ownership Letter from President," which confirms Aslan International's tax

exempt status and corporate structure.  *Id.*, at 13.

Next, the United States submitted recordings of two phone calls made by

Joshua Edwards to his mother and sister while at MCC Chicago.   Doc. No. 213-9;

*see also* Doc. No. 213-10 (Trufone phone log listing 496 calls between November 18,

2023 and January 7, 2024, all to phone number 386-847-8104).[15]   Upon review of

these phone calls, the undersigned notes that Joshua Edwards was able to navigate

the phone system, which required inputting a code and responding to voice

prompts.   He was aware of how many minutes remained for each call, and asked

his family members when a good time would be to call again.   While the majority

of both phone calls centered on Bible sermons and verses and Joshua Edwards

utilized a soft and childlike voice, he was able to communicate clearly, respond

---

[15] While Dr. Abdelaal discusses in her report reviewing numerous phone calls, the United States has only submitted recordings for two of them.   Joshua Edwards did not request or submit any additional recordings for the undersigned to consider, nor objected to the undersigned's consideration of Dr. Abdelaal's summary of these other phone calls in her report.   Doc. No. 213-2.   Joshua Edwards also argues that these calls suggest that his family was coaching him and providing him information due to a lack of understanding.   Doc. No. 205, at 15-16.   The undersigned disagrees and finds these calls demonstrate an ability to communicate and process information and to respond appropriately.

appropriately to questions, and ask relevant questions in response.   There was a back and forth dialogue.   Joshua Edwards also demonstrated social awareness, during the second phone call a family member was crying.   Joshua Edwards appropriately responded by consoling the family member, saying "don't cry" and "don't worry," that he would be back home soon.   He also expressed concern that this family member was being properly taken care of, to include receiving sufficient food.[16]

The last set of exhibits the United States submitted consists of five videos each under one minute in duration, and one eight-minute podcast recording, all of which were posted on Joshua Edwards' Facebook page between December 22-28, 2019. Doc. No. 213-7.   The undersigned has viewed each of these recordings, which address Bible verses and sermons.   Unlike his prior communications, in these videos and podcast recordings, Joshua Edwards speaks clearly and loudly in complete sentences, there are no childlike mannerisms.   In the videos it appears that he is reading off of a script as his speech is flat without any affect and his eyes can be seen moving as if reading.   The podcast recording is similarly in a loud and

---

[16] During the second call it appears that Joshua Edwards and his family members switched between English and a foreign language.   The undersigned has based her observations on the English portion as no translation was provided.

strident voice, and while the majority of it is in a flat affect, there are a few instances where Joshua Edwards' voice modulates while he is telling a story.

## IV.    ANALYSIS

A defendant is incompetent if (1) he is presently suffering from a mental disease or defect that results in his (2) inability to understand the nature and consequences of the proceedings against him or (3) to assist properly in his defense. 18 U.S.C. § 4241(d).   Stated differently, the question is whether, due to a mental disease or defect, "the defendant had 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and whether he had 'a rational as well as factual understanding of the proceedings against him.'"   *United States v. Cruz*, 805 F.2d 1464, 1479 (11th Cir. 1986) (quoting *Dusky*, 362 U.S. at 402).

In this case, the parties disagree on all three factors.   However, based on a review of the above detailed evidence, the undersigned finds, and will recommend to the Court, that the United States has established by a preponderance of the evidence that Joshua Edwards' does not suffer from a mental disease or defect that renders him incompetent, but rather that he is malingering, and that his competency has therefore been restored.

First, while there is some evidence that Joshua Edwards may have intellectual disabilities, there is no evidence of any actual diagnosis.   There are no records (education, employment, medical, etc.,) nor are there any expert opinions

definitively diagnosing Joshua Edwards with ASD or any other intellectual or cognitive disability.   At most, a lone "tentative opinion" as to competency and a "rule out" diagnosis of ASD by Dr. Micono has been offered.   But Dr. Micono also noted a "rule out" diagnosis of malingering, which is supported by Dr. Danziger and Dr. Abdelaal.   And while there is evidence that Joshua Edwards may have some cognitive deficiencies (as suggested by his low WAIS-IV test scores and), that alone is not sufficient to render him legally incompetent to proceed.   *See Estelle*, 534 F.2d at 612 (low intelligence does not equal to mental incompetency); *Deruiter*, 2017 WL 9360880, at *26, *report and recommendation adopted*, 2017 WL 3308967 (M.D. Fla. Aug. 3, 2017) ("[A] review of relevant case law demonstrates that a low IQ does not necessarily render a defendant incompetent to proceed." (citing *United States v. Glover*, 596 F.2d 857, 864–65 (9th Cir. 1979); *United States v. Carter*, No. 1:12-CR-29, 2013 WL 6668715, at *13 (E.D. Tenn. Dec. 18, 2013))); *Gutierrez v. United States*, No. 8:11-cr-313-T-30EAJ, 2014 WL 6473743, at *7 (M.D. Fla. Nov. 18, 2014) ("[H]aving a low IQ or mental deficiency does not necessarily mean that [a 2255 petitioner] was incompetent to stand trial." (citing *Medina*, 59 F.3d at 1107)).[17]

---

[17] Moreover, to the extent Joshua Edwards' reading abilities and processing speeds are slower, various accommodations can be provided, such as allowing him more time to review documents, having his attorneys explain the documents to him, or allowing Joshua Edwards more frequent breaks during trial to consult with his attorneys.

Second, there is strong and consistent evidence that Joshua Edwards is malingering.   His phone calls with his mother and sister demonstrate an ability to engage in conversations, take direction and advice and apply it to his circumstances, decide what information to discuss, and respond appropriately to questions, social cues, and emotions.   He is able to follow rules, routines, and schedules at the various facilities at which he has been detained without any issue. He is able to recall his family and educational history and received a doctoral degree from an unaccredited institution.[18]   He was able to engage in a relevant and intelligible conversation with Officer Mondejar during and after his arrest, and was able to ask for an attorney after receiving his Miranda rights.   Despite stating that he cannot read or write, Joshua Edwards was frequently observed – both at FDC Englewood and MCC Chicago and in his Facebook posts – reading without any difficulties.   And to the extent the Aslan International letters are accurate (and no challenge to them was made), Joshua Edwards was able to hold a high-level

_____

[18] Joshua Edwards argues that this degree should not be given much weight because it is not from a "rigorous field of study or discipline, such as physics, science, literature, or history," or from an accredited institution.   Doc. No. 205, at 16-17.   Not only is this argument speculative, but Joshua Edwards provides no legal authority to support his contention that where a degree is obtained and the particular field of study is relevant to a determination of legal competency.   *Cf. United States v. Merriweather*, 921 F. Supp. 2d 1265, 1307 n.62 (N.D. Ala. 2013) ("The *Dusky* standard, as commentators have noted, does not require that a defendant have a high level of ability or performance.   After all, a defendant surely does not have to be as intelligent and reasonable as his lawyers to be competent to stand trial." (citation omitted)).

position as Technical Operations Manager for years and exhibited managerial and executive skills.

It is only when Joshua Edwards is faced with legal competency related assessments or programs or asked questions about his case that he refuses to participate, refuses to communicate, and claims no memory or understanding of even the most simple and basic topics.[19]   The evidence shows that he would take active steps to avoid interaction with staff at MCC Chicago, and would refuse to participate in restoration programs.   He continues with that behavior to date – he has repeatedly refused to speak with his counsel and his retained expert Dr. Otto.

Moreover, there is evidence that Joshua Edwards has engaged in deception. In addition to misrepresenting his reading abilities, he repeatedly stated that he would not talk to anyone, answer questions, or participate in any assessment or restoration related matters without talking to his attorney.   However, when provided multiple opportunities to communicate with his attorney he refused –

---

[19]   The undersigned notes that Joshua Edwards' memory lapses do not, by themselves, render him incompetent.  *See United States v. Rinchack*, 820 F.2d 1557, 1569 (11th Cir. 1987) ("Amnesia does not render a defendant automatically incompetent to stand trial." (citations omitted)); *United States v. Dewhart*, No. 2:06-cr-94-WKW, 2009 WL 1850181, at *3 (M.D. Ala. June 26, 2009) ("[L]ack of memory does not necessarily negate [the] ability to assist counsel and understand the proceedings.   Amnesia does not *per se* render a defendant incompetent to stand trial." (citing *Rinchack*, 820 F.2d at 1569)).

despite having a clear ability to utilize the phone system at both FDC Englewood

and MCC Chicago.   *See,* Doc. No. 213-10.[20]

Third, this is not a case where the expert opinions are diametrically opposed,

but instead they appear to be in agreement to a large degree.   Both Dr. Danziger

and Dr. Abdelaal opined that Joshua Edwards is malingering.   And Dr. Micono,

while not ruling out an ASD diagnosis, also found evidence of malingering and did

not rule out that diagnosis as well.   Rather, in recognizing the limitations of a 30-

day evaluation process, Dr. Micono rendered a "tentative opinion" as to

incompetency and noted that any diagnoses and related deficiencies would be

---

[20] The undersigned encountered similar behavior during hearings where Joshua
Edwards was present.   Initially, Joshua Edwards would respond to my questioning, albeit
in a childlike manner.   However, his demeanor changed after listening to a discussion
between the undersigned and counsel during the April 8 2024 status conference through
which the undersigned explained the difference between an inability to communicate as
opposed to the decision not to communicate.   Immediately after this discussion and since
that date, Joshua Edwards has refused to make eye contact and refused to respond to the
undersigned's questioning.  Despite this lack of communication, Joshua Edwards has
remained alert and behaved appropriately at all court proceedings, including during the
July 10, 2024 competency hearing.   *See, e.g.*, *United States v. Grissom*, No. 1:17-CR-39-MLB-
AJB, 2018 WL 6730000, at *4 (N.D. Ga. Nov. 2, 2018), *report and recommendation adopted*, 2018
WL 6727263 (N.D. Ga. Dec. 20, 2018) (finding defendant competent to proceed in part
because he behaved appropriately during the competency hearing, appeared aware of the
proceedings and was alert, and "did not engage in any disturbing, obstructive, or
distracting behavior in the courtroom."); *United States v. Hood*, No. 1:16-CR-119-HSM-CHS,
2019 WL 692818, at *5 (E.D. Tenn. Jan. 24, 2019), *report and recommendation adopted*, 2019 WL
691396 (E.D. Tenn. Feb. 19, 2019), *aff'd*, 827 F. App'x 524 (6th Cir. 2020 (finding defendant
competent in part because during multiple court hearings defendant "was able to act
appropriately in the courtroom and did not disrupt the Court's proceedings.").

clarified during the lengthier restoration process.   Doc. No. 213-5, at 16.   That is
what happened here.

All of this evidence, to include Joshua Edwards' behavior, his selective
memory loss and selective ability to communicate, and the expert opinions and
testimony, support a finding that Joshua Edwards is competent and malingering,
and that he is able to understand factual concepts, to make rational decisions, and
to communicate when he so chooses.   *See United States v. Porter*, 907 F.3d 374, 379
(5th Cir. 2018) (affirming finding of competency where district court credited BOP
expert who opined defendant was malingering, noting in particular that defendant
possessed the ability to cooperate and merely chose not to, he routinely interacted
normally with inmates and prison staff, but refused to cooperate during the
competency evaluation); *United States v. Dewhart*, No. 2:06-CR-94-WKW, 2009 WL
1850181, at *3 (M.D. Ala. June 26, 2009) (finding defendant competent and
malingering where he demonstrated selective amnesia without explanation; he
could remember facts before and after the alleged offense, but could not remember
the offense itself).

Joshua Edwards makes several arguments in support of a finding of
incompetency.   First, he contends that the undersigned should focus on his
behavior at the December 14, 2022 initial appearance and other in-court
proceedings, and that the pretrial bail report lists a learning disability and informal

autism diagnosis.   Doc. No. 205, at 7-8; Doc. No. 219, at 12-13.   The undersigned agrees that Joshua Edwards' behavior in court should be considered, and the undersigned has described his behavior as well as her own observations of Joshua Edwards during court proceedings throughout this report and recommendation. But contrary to Joshua Edwards' position, his behavior does not support a finding that he is unable to communicate or assist in his defense.   Rather, it only reinforces the finding that Joshua Edwards is choosing when to communicate and when to respond.   He was able to speak cogently with Officer Mondejar, yet refused to respond in court a few short hours later.   He was able to communicate with the undersigned during a status hearing, but then refused to engage further after listening to the undersigned's discussion with counsel.   In short, Joshua Edwards' behavior only buttresses the opinions of Dr. Danziger and Dr. Abdelaal (as well as the rule out diagnosis of Dr. Micono) that Joshua Edwards is malingering and exaggerating his purported communication and cognitive deficiencies.[21]

---

[21] While not admitted into evidence, the undersigned also has considered the pretrial bail report, in which it is noted that Joshua Edwards refused to be interviewed. Doc. No. 18.   The information in that report was elicited from Joshua Edwards' mother and sister, both of whom later failed to return Dr. Abdelaal's call, and the information provided regarding any possible autism diagnosis or learning disability is inconsistent with the manner in which these family members communicated with Joshua Edwards during his BOP phone calls.   The undersigned further notes that the pretrial bail report lists Joshua Edwards as employed as a missionary with a $130,000 yearly salary.   *Id.*

Next, Joshua Edwards argues that the only opinion that should be given any weight is that of Dr. Micono.   Dr. Danziger's opinions should be rejected because he was unable to conduct any forensic testing and instead relied on inconsistent and unreliable information from unidentified Orange County corrections officers. Doc. No. 205, at 9-10.[22]   And Dr. Abdelaal's opinions should be rejected because she is not board-certified, she was unable to interview Joshua Edwards or perform any psychological or competency-related testing, she "appears to have a track record for finding defendants competent to proceed," and because she relied on brief interactions, collateral sources, conjecture and a flawed interpretation of Dr. Micono's report.   *Id.*, at 13-17; Doc. No. 219, at 2-7, 19-22.[23]

---

[22] Joshua Edwards further argues the United States "tacitly conceded" that Dr. Danziger's report is insufficient to determine Joshua Edwards' competency when the United States did not object to a second competency evaluation at FDC Englewood.   Doc. No. 205, at 10.   The undersigned finds this argument unpersuasive, as it is clear that this second examination was ordered solely due to Joshua Edwards' then-counsel's request. *See, e.g.*, 18 U.S.C. § 4247(d).   The United States at no point made any representations that Dr. Danziger's report was unreliable.

Nor does the undersigned accept Joshua Edwards' invitation to place no weight on Dr. Danziger's report simply because he was not called as a witness.   Doc. No. 219, at 22. Not only is this argument without legal support, but if the undersigned were to accept it, then Dr. Micono's report would be rejected for the same reason.

[23] Joshua Edwards also makes mention that he was not provided any mental health treatment during the four-month period between his designation to a BOP facility for restoration and his arrival at MCC Chicago.   Doc. No. 219, at 16-17.   However, there is nothing in the record to suggest any such treatment was warranted or would be appropriate, nor does Joshua Edwards suggest that any treatment exists for ASD, thus the undersigned does not find this point to be determinative of competency or entitled to much weight.

Instead, Joshua Edwards argues that the undersigned should only rely upon the opinions of Dr. Micono.   Doc. No. 205, at 10-13; Doc. No. 219, at 22-23.   He contends that Dr. Micono's opinions are more reliable because she is board-certified in forensic psychology, she was able to conduct psychological testing of Joshua Edwards, she was able to review case materials, and she met with Joshua Edwards on several occasions for extended periods of time.   *Id.*

The undersigned disagrees.   To begin, and as noted above, the undersigned does not find that the opinions of the three experts are diametrically opposed but rather agree that there is evidence of malingering and in many respects align. Moreover, Dr. Micono relied upon Dr. Danziger's report, and Dr. Abdelaal in turn relied upon Dr. Micono's report – in other words they are not in conflict for the most part and instead support each other.   And while Dr. Abdelaal may not be board-certified, the undersigned does not find this fact dispositive.   Rather, Dr. Abdelaal's opinions regarding malingering are supported by the evidence discussed above, to include Joshua Edwards' behavior during phone calls, while at both BOP facilities, during his arrest, and in court.   Her opinions are further supported by Dr. Danziger's report, and Dr. Micono also noted evidence of malingering.   The undersigned's own review of Joshua Edwards' Facebook posts also support Dr. Abdelaal's opinions and testimony.

The lack of any competency-related testing is also not determinative, as no expert – including Joshua Edwards' retained expert Dr. Otto – were able to conduct such testing, due solely to Joshua Edwards' affirmative refusal to participate.[24]   *See Porter*, 907 F.3d at 381-82 (rejecting argument that defense expert who was able to conduct some testing should be credited over BOP expert who was unable to conduct competency tests due to defendant's refusal to cooperate; instead finding that the BOP expert's report "indicate[d] that [defendant] can cooperate when he wants to."); *United States v. Nissen*, 550 F. Supp. 3d 1002, 1015 (D.N.M. 2021) ("A defendant's refusal to participate in a psychological evaluation is not necessarily evidence of the defendant's mental incompetency, particularly where there is reason to believe the defendant may be malingering or manipulating the system." (citation and quotation marks omitted)); *United States v. Nava-Aguiniga*, No. 2:11-CR-111 TS, 2012 WL 4748915, at *3 (D. Utah Oct. 4, 2012) (finding defendant competent in part based on expert who provided a "rule out" diagnosis of malingering, where defendant refused to cooperate in evaluation, but expert was able to review prior evaluations, interact with defendant, and observe defendant).

---

[24] The undersigned also does not give much weight to Joshua Edwards' apparent argument that Dr. Abdelaal is biased towards finding a defendant competent to proceed. The argument is based on speculation and lacks any legal authority in support.

The undersigned also rejects Joshua Edwards' argument that Dr. Abdelaal's opinions should be given little to no weight due to the length of time she spent with him.   While Dr. Abdelaal was unable to conduct any testing or assessments due to Joshua Edwards' refusal to participate, she observed him continuously over an approximately four-month period, and received regular reports from MCC Chicago staff who also observed Joshua Edwards on a continuous basis.   Such daily observations of Joshua Edwards' behavior provide strong evidence to support Dr. Abdelaal's opinions.   *See United States v. Merriweather*, No. 2:07-CR-243-RDP-JEO, 2014 WL 5770213, at *43 (N.D. Ala. Nov. 5, 2014) (finding more credible the opinions of the government experts because they had the greatest ability to observe and monitor the defendant in his daily life over the course of more than one year, and those observations were supported by the continuous observation of defendant by other medical and correctional staff); *United States v. Scott*, No. 06-00410-04-CR-W-DW, 2009 WL 648880, at *11 (W.D. Mo. Mar. 11, 2009) (crediting BOP expert who met with defendant on multiple occasions and was able to obtain information from nursing and correctional staff over defense experts who only met with defendant twice for a total of three hours); *United States v. Hoyt*, 200 F. Supp. 2d 790, 794 (N.D. Ohio 2002) (crediting expert in competency proceeding who "was able to observe and treat Defendant . . . for a significantly longer period of time than that which [the defense expert] treated Defendant," and who "was able to supplement his own

observations with those of other members of the nursing and correctional staff"). Indeed, Dr. Micono herself apparently recognized that her 30-day evaluation of Joshua Edwards was only sufficient to render a "tentative opinion" and that commitment for restoration would allow for a longer period of observation, and a more thorough clarification of any diagnoses and associated deficits.   Doc. No. 213-5, at 16.

For these reasons, the undersigned has given more weight to the opinions of Dr. Abdelaal and Dr. Danziger, credited the "rule out" diagnosis of malingering from Dr. Micono, and given less weight to Dr. Micono's "rule out" diagnosis of ASD.   *See Bradley*, 644 F.3d at 1268 ("[F]aced with diametrically opposite expert testimony, a district court does not clearly err by simply crediting one opinion over another where other record evidence exists to support the conclusion." (alteration in original) (quoting *Battle*, 419 F.3d at 1299)); *United States v. Giraldo*, No. 2:09-cr-85-FtM-36SPC, 2011 WL 7946037, at *17 (M.D. Fla. Oct. 24, 2011), *report and recommendation adopted*, 2012 WL 1890508 (M.D. Fla. May 23, 2012) (citations omitted) (noting that in determining a defendant's competency to stand trial, the court may rely on one of two competing opinions given by qualified experts)); *see also United States v. Izquierdo*, 448 F.3d 1269, 1279 (11th Cir. 2006) (affirming competency finding based in part on BOP expert who studied defendant for several

months and "had the benefit of the observations and information collected about [the defendant] by his forensic team.").

Third and finally, Joshua Edwards argues that the undersigned should focus on Joshua Edwards' behavior and lack of communication with counsel, as well as counsel's own impressions of his competency.   Doc. No. 205, at 18-20.   Counsel has made numerous attempts to meet with Joshua Edwards and has been unable to engage in any meaningful discussions, which counsel asserts further supports a finding of incompetency.   *Id.*; Doc. No. 219, at 17-18.[25]

While not dispositive, a defense attorney's view of the competency of his client "is unquestionably a factor which should be considered."   *Drope*, 420 U.S. at 177 n.13.   *See also United States v. Flores-Velasquez*, 651 F. App'x 861, 864 (11th Cir. 2016) ("[A] lawyer's representations concerning the competence of his client . . . is unquestionably a factor which should be considered in deciding whether a defendant's competence requires examination." (citation and quotation marks omitted)).   *Cf. United States v. Mason*, 52 F.3d 1286, 1292 (4th Cir. 1995) (holding that the "[o]utright rejection" of counsel's observations in a competency determination

---

[25] Joshua Edwards also argues in his briefing that the finding of malingering should be rejected because he has no incentive to malinger as he would likely be eligible for pretrial release. Doc. No. 205, at 20-21; Doc. No. 219, at 23.   He does not support that argument with any legal authority, however.   *See id.*   And the undersigned notes that whether or not Joshua Edwards would be subject to pretrial release does not change the fact that he is facing multiple felony charges with potential lengthy terms of incarceration, which he does not address.   *See id.*

was unwarranted).    However, while defense counsel clearly is in a unique position to observe Joshua Edwards and can provide insight, his opinions are not determinative.  *See United States v. Merriweather*, 921 F. Supp. 2d 1265, 1303 (N.D. Ala. 2013) ("[T]he court is not obligated to accept without question the assertions of the lawyers concerning the competence of a defendant." (citing *Drope*, 420 U.S. at 177 n.13)); *see also Flores-Velasquez*, 651 F. App'x at 864.

The undersigned finds counsel's experiences with Joshua Edwards to mirror those experienced by all three experts; Joshua Edwards simply refuses to engage in any discussions related to his case or in any assessments related to his legal acumen or competency.    But again, these are affirmative choices Joshua Edwards is making (in apparent consultation with his family), as readily evidenced by the fact that he will communicate with others and engage in other proceedings and events, just not anything related directly to his case.    Thus, this is not a situation where a defendant is *unable* to communicate or understand, rather the evidence points to Joshua Edwards *refusing* to do so.  *See Merriweather*, 921 F. Supp. 2d at 1304 ("It is worth emphasizing that the *Dusky* standard refers to the *ability* of a defendant to communicate with his attorneys, not his *willingness* to communicate with his attorney." (emphasis in original)); *see also United States v. Jones*, 642 F.3d 1151, 1160-61 (D.C. Cir. 2011) ("[U]ncooperativeness with one's counsel does not alone prove an inability to communicate." (citations omitted)); *United States v. Battle*, 613 F.3d

258, 263 (D.C. Cir. 2010) ("The relevant legal question is not whether appellant will assist properly in his defense, but whether is he is *able* to do so.") (emphasis in original) (citation and quotation marks omitted)); *United States v. Hood*, No. 1:16-CR-119-HSM-CHS, 2019 WL 692818, at *5 (E.D. Tenn. Jan. 24, 2019), *report and recommendation adopted*, 2019 WL 691396 (E.D. Tenn. Feb. 19, 2019), *aff'd*, 827 F. App'x 524 (6th Cir. 2020) ("The fact that Defendant chooses not to assist in his defense does not, *per se*, render him incompetent. . . .   Here it is evidence that Defendant's refusal to cooperate with his attorney and with the Court is not rooted in mental illness, but rather in some intentional strategy formulated by Defendant."); *see also United States v. Marks*, No. 6:17-cr-257-PGB-LHP, 2022 WL 8227893, at *30 (M.D. Fla. Apr. 15, 2022), *report and recommendation adopted*, 2022 WL 4129539 (M.D. Fla. Sept. 12, 2022) (finding defendant's behavior as observed in video and audio recordings more persuasive than impressions of counsel in assessing competency).

In summary, while there is some evidence that Joshua Edwards suffers from some degree of intellectual deficits, there is a wealth of evidence to support a finding that he is not incompetent.   The expert opinions provided, the telephone recordings and Facebook postings, Joshua Edwards' behavior as observed by Officer Mondejar and BOP staff, and in particular Joshua Edwards' apparent voluntary decision as to when or to whom he will communicate with, all point to a

finding that he is not suffering from a mental disease or defect that renders him incompetent, and that he has an ability to communicate, understand facts, and make decisions to follow the advice of others and affirmatively choose whether to cooperate in his case.  The undersigned's own observations of Joshua Edwards confirm the expert reports and opinions as to his competency and malingering, and the nature of the conduct at issue in this case – which is a sophisticated scheme to defraud – does not contradict a finding that Joshua Edwards possesses intellectual capabilities above what is argued.

For these reasons, the undersigned finds that the preponderance of the evidence demonstrates that Joshua Edwards does not suffer from a mental disease or defect such that he lacks a sufficient present ability to consult with his lawyers with a reasonable degree of rational understanding, or that he lacks a factual and rational understanding of the proceedings against him.  *See, e.g.*, *United States v. Villegas*, No. CR 06-1733-TUC-DCBGEE, 2008 WL 619186, at *2 (D. Ariz. Mar. 3, 2008) (finding defendant competent who refused to participate in competency evaluation, refused to communicate or interact with counsel in any manner, and refused to respond to any questions from the court during a hearing; BOP expert opined that defendant made a "volitional choice to not cooperate with counsel in his defense, or participate in the court proceedings"); *see also Porter*, 907 F.3d at 379 (affirming finding of competency where district court credited BOP expert who

opined defendant was malingering, noting in particular that defendant possessed the ability to cooperate and merely chose not to, he routinely interacted normally with inmates and prison staff, but refused to cooperate during the competency evaluation); *United States v. Simpson*, 645 F.3d 300, 306-07 (5th Cir. 2011) (affirming finding of competency where district court held multiple competency hearings, defendant was evaluated at two Federal Medical Centers, multiple doctors testified that defendant was not mentally ill, and while some evidence existed to suggest a mental condition, a great deal of evidence existed to support a finding that defendant was purposefully engaging in manipulative conduct and was "purposefully refusing to communicate" with his attorneys); *Nava-Aguiniga*, 2012 WL 4748915, at *3 (finding defendant competent in part based on expert who provided a "rule out" diagnosis of malingering, where defendant refused to cooperate in evaluation, but expert was able to review prior evaluations, interact with defendant, and observe defendant).   *Cf. Jones*, 642 F. 3d at 1160-61 (finding no abuse of discretion where district court did not order a competency hearing and held that defendant was "perfectly competent" based on court's observations of defendant during several hearings, and despite defendant's refusal to speak with his attorney and refusal to participate in a competency hearing).

## V.    RECOMMENDATION

For these reasons, the undersigned **RESPECTFULLY RECOMMENDS** that the Court find that Joshua Edwards' competency has been restored and he is presently competent to stand trial.[26]

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from the date the Report and Recommendation is served to serve and file written objections to the Report and Recommendation's factual findings and legal conclusions.  Failure to serve written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   11th Cir. R. 3-1.

Recommended in Orlando, Florida on December 20, 2024.

LESLIE HOFFMAN PRICE
UNITED STATES MAGISTRATE JUDGE

---

[26] Should the Court conclude that Joshua Edwards' competency has not been restored, the undersigned respectfully recommends that the Court conduct further proceedings to determine whether Joshua Edwards should be committed to the custody of the Attorney General for a dangerousness assessment under 18 U.S.C. § 4246(b), and/or hearing under 18 U.S.C. § 4246(d).   *See, e.g.,* Doc. Nos. 235, 239-41.

Copies furnished to:

Presiding District Judge
Counsel of Record