UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 6:22-cr-201-AGM-LHP |
| | ) | |
| JOSHUA EDWARDS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT JOSHUA EDWARDS'S SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE

### I.    INTRODUCTION

The defendant, Joshua Edwards ("Mr. Edwards"), stands before this Court as a 35 year old man, with zero criminal history points who has been in federal custody since December 14, 2022.  Thus, he has already served over three years in connection with the instant case.  However, instead of serving that time in a federal facility that offers programs and educational opportunities, Mr. Edwards has spent the majority of his time in custody at the Orange County Jail, where he has had to learn to survive amongst experienced and dangerous criminals.  This ordeal has been particularly difficult for Mr. Edwards who has never lived apart from his immediate family.    In   fact,   throughout   his   childhood,   he   struggled   with

intellectual challenges and was home schooled so that he could avoid bullying. In the plea agreement, the government has agreed to recommend a term of imprisonment of 36 months, which is the equivalent of time served. Doc. 339, ¶ 6. The government's recommendation recognizes the obvious – that Mr. Edwards, a man with no criminal convictions who played a limited role in the offense, has already suffered sufficient punishment for his crimes. The government's recommendation also factors in the reality that Mr. Edwards, a Canadian citizen, will be deported back to his home country after he completes his sentence. As set forth in greater detail below, Mr. Edwards respectfully requests that this Honorable Court accept the government's recommendation and impose a sentence below his advisory guidelines range to a term of imprisonment of 36 months or less. Such a sentence would be sufficient, but not greater than necessary to address both Mr. Edwards's offense conduct as well as the many mitigating factors present in the instant case. *See* 18 U.S.C. § 3553(a).

II.   **MITIGATING FACTORS IN MR. EDWARDS'S HISTORY AND CHARACTERISTICS THAT JUSTIFY A DOWNWARD VARIANCE**

Pursuant to *United States v. Booker,* 543 U.S. 220, 245-67 (2005), a sentencing court is now unencumbered in its ability "to consider every convicted person as an individual and every case as a unique study in the human failings that

2

sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States*, 518 U.S. 81 (1996)).

In order to satisfy § 3553(a), and ensure "that the punishment will suit not merely the offense but the individual defendant[,]" this Court is free to consider "the widest possible breadth of information about" Mr. Edwards. *Pepper v. United States*, 562 U.S. 476, 488 (2011); *see also* 18 U.S.C. § 3661. The Guidelines are "effectively advisory" and constitute only "one factor among several [that] courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007) (quotation marks removed). Stated differently, a district court is "not bound" by the Guidelines including their provisions (repealed in 2025) addressing when departures from the otherwise-applicable Guidelines range are appropriate. *See United States v. Strother*, No. 24-4291, 2026 U.S. App. LEXIS 190, at *5, n. 1 (4th Cir. Jan. 6, 2026) (citing *Booker* and U.S.S.G. Ch. 1, Pt. A; U.S.S.G. App. C, amend. 836).

Addressed below are several mitigating factors that justify a downward variance for Mr. Edwards.

3

### A.    Extremely Strong Family Ties

Mr. Edwards was born in 1992 in Edmonton, Canada.  Doc. 359, ¶ 75.  His family consists of his two parents and his sister, Joy Edwards, who is five years older than him.  *Id.* at ¶¶ 75-76.  His entire life prior to his arrest in this case was centered around his immediate family and their Christian faith.  Mr. Edwards had never lived apart from his parents and sister.  *Id.* at ¶¶ 75, 76.  The family operated a Christian ministry, which served as Mr. Edwards's sole source of engagement and employment throughout his life.  *Id.* at ¶ 88-90.

Growing up, Mr. Edwards had no real friendships and spent all of his time with his family.  Doc. 242 at 24; Doc. 213-5 at 15.  In fact, he reported having never dated or been in a romantic relationship in his life.  Docs. 242 at 17; Doc. 213-5 at 3.  When he was arrested, Mr. Edwards was living at a house in New Smyrna Beach, Florida, where he had resided with his family since 2018.  Doc. 359, ¶ 79; Doc. 242 at 16; Doc. 213-5 at 3.

Mr. Edwards's family still live in the Middle District of Florida at the New Smyrna Beach residence.  Doc. 359, ¶ 79.  His family remains extremely supportive and his sister speaks to him on a daily basis.  *Id.* at ¶ 76.  For example, when Mr. Edwards was temporarily incarcerated at a Bureau of Prisons ("BOP") facility for competency evaluations, he spoke with his mother and sister approximately 800

times.  Doc. 242 at 29; Doc. 213-2 at 7-9.  During these calls, the family regularly discussed the Bible and verses from the scripture.  Doc. 242 at 30; Doc. 213-2 at 8-9.  In these communications, Mr. Edwards used a "soft and childlike voice."  Doc. 242 at 40.

Unfortunately, during Mr. Edwards's incarceration in the instant case, both of his parents have experienced significant health issues.  He was originally arrested with his father, Evan Edwards, who was also named as a defendant in the indictment filed in this case.  Doc. 359, ¶¶ 1, 5-6.  However, the case against his father was eventually dismissed because his father was found incompetent with little likelihood of being restored to competency in the future.  *Id.* at p. 2.  Specifically, Mr. Edwards's father suffers from "moderate to severe dementia and significant and permanent cognitive deficits."  Doc. 359, ¶ 75; Doc. 243 at 15.  His father has also experienced "injuries to his heart, kidneys, and lungs, brain swelling and brain hemorrhages, as well as a stroke, has been hospitalized on several occasions, and is largely bedridden."  *Id.* at 15.  More recently, Mr. Edwards's mother suffered from her own stroke and was hospitalized.  Doc. 359 at ¶ 75.  His sister cares for both parents at the family's home.  *Id.* at ¶ 76.  It is Mr. Edwards's sincere hope to be reunited with his family someday so that he can help care for his ailing parents and relieve the burden on his older sister.  *Id.*

It is well-established that strong family and community support may form the basis for a downward variance from the guidelines. *See e.g. United States v. Sayad*, 589 F.3d 1110, 1118 (10th Cir. 2009) (district court was affirmed on appeal after considering, *inter alia*, the defendant's "close-knit" family and community in the granting of a downward variance to a probationary sentence); *United States v. Wachowiak*, 496 F.3d 744, 746 (7th Cir. 2007)[1] (district court's downward variance was found not unreasonable where that court found, *inter alia*, that the defendant's "supportive family and friends would assist in his rehabilitation").

### B.    *Autism and Other Struggles*

According to Mr. Edwards's Pretrial Services Report, his mother reported in December of 2022 that the defendant had a learning disability, that he was homeschooled, and that he suffered from autism.  *See Pretrial Services Report*; Doc. 242 at p. 47-48.  Moreover, Jessica Micono, Psy. D., ABPP, a board-certified forensic psychologist employed by the BOP who evaluated Mr. Edwards concluded that he exhibited both "possible signs of malingering and the possible presence of Autism Spectrum Disorder ("ASD")."  Doc. 94; Doc. 242 at 4.  Additionally, Y. Abdelaal, Psy.D. ("Dr. Abdelaal"), the BOP psychologist who concluded that Mr.

---

[1] Abrogated on other grounds as stated in *United States v. Bartlett*, 567 F.3d 901, 909 (7th Cir. 2009).

Edwards was competent to proceed also observed signs of cognitive defects in Mr. Edwards as well as eccentric behaviors and characteristics that could be consistent with an individual suffering from autism spectrum disorder.  Doc. 215 at 56.  She also testified that his behavior could suggest "schizoid or schizotypal disorder." *Id.*

Because of Mr. Edwards' social and academic shortcomings, his family pulled him out of school and educated him at home throughout his childhood. Doc. 359 at ¶¶ 88-89.  He later obtained degrees in ministry from an unaccredited educational institute.  *Id.* at ¶ 88.  As noted, he spent his entire adult life working for his father's ministry.  *Id.* at ¶ 90.

During his incarceration, Mr. Edwards has required regular consultation and guidance from his mother and sister.  For example, during his time at FDC Englewood, when he was undergoing competency evaluations, he regularly called his mother and sister and spoke in a "childlike manner and was repetitive in his questions to his family."  Doc. 213-5 at 10; Doc. 242 at 19.  In some of these calls, his family would suggest or instruct him to answer questions either "I don't remember," "I don't recall," or that he should not answer the questions or talk without a lawyer.   Doc. 213-5 at 8-10, 14; Doc. 242 at 20.  Later, when he was at MCC Chicago receiving competency restoration treatment, he regularly called his

7

mother and sister.  Doc. 213-2 at 8-9; Doc. 242 at 30.  These phone calls with his mother and sister primarily focused on Bible verses and prayers, and it appeared as though his family members were providing him guidance on how to behave while at MCC Chicago, including advising him to be "inconspicuous and quiet." Doc. 215 at 47-49; Doc. 242 at 35.

The foregoing suggests that Mr. Edwards depended on his family in a manner that is not consistent with a 35 year old man of average mental health and intelligence.  His competency in this matter was litigated extensively.  He does not challenge the Court's finding that he is competent to proceed.  Nonetheless, the Court's sentence must reflect his lack of maturity and intellectual shortcomings as demonstrated by the above-described evidence.  *See* 18 U.S.C. § 3553(a)(1) (instructing the district court to consider "the history and characteristics of the defendant"); *see also United States v. Williams*, 553 F.3d 1073, 1085 (7th Cir. 2009) (remanding for the district court to consider the defendant's "actual disability and the combination of his disability with his susceptibility to manipulation"); *Gall v. United States*, 552 U.S. 38, 58 (2007) ("Immaturity at the time of the offense conduct is not an inconsequential consideration." (quoting *United States v. Gall*, 374 F. Supp. 2d 758, 762 n.2 (S.D. Iowa 2005))).  In fact, courts have granted downward variances or departures based on a defendant's mental health struggles or

8

intellectual limitations.  *See e.g. United States v. Blake*, 89 F. Supp. 2d 328, 338-39 (E.D.N.Y. 2000) (departing downward due to defendant's psychiatric impairments); *United States v. Cotto*, 793 F. Supp. 64 (E.D.N.Y. 1992) ("In the instant case, in combination, the defendant's near retardation, his vulnerability, his efforts at rehabilitation, and the incompetence reflected in the execution of the crime warrant a downward departure."); *United States v. Perkins*, 295 U.S. App. D.C. 356, 963 F.2d 1523, 1527 (D.C. Cir. 1992) (remanding for district court to consider defendant's diminished mental capacity for purposes of downward departure); *United States v. Glick*, 946 F.2d 335, 339 (4th Cir. 1991) (approving departure); *United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir. 1990) (recognizing defendant's general lack of sophistication as basis for downward departure).

### C.    *Pre-Sentencing Detention Length and Conditions of Confinement*

As noted above, Mr. Edwards has been detained in this case for over three years.  He spent the vast majority of that time at the Orange County Jail, amongst seasoned and experienced criminals.  Mr. Edwards did not have a criminal history but he was automatically detained at his initial appearance because his mental competency was in dispute and he had to remain incarcerated so that he could be subjected to evaluations.  *See* Docs. 9, 11, 14, 19.  For the next two years and three months, from December 2022 through March 2025, his competency proceedings

were ongoing but eventually the Court determined that his mental fitness to proceed had been restored.  *See* Docs. 9, 14, 70, 72, 94, 97, 121, 123, 201, 209, 213, 242, 251.  Finally, on April 18, 2025, after a hearing, a formal detention order was entered committing Mr. Edwards into federal custody pending trial.  Docs. 269-270.

Because of his mental competency issues, Mr. Edwards spent a far longer period of time in pretrial detention than the national average.  *See* Table H-9A—Federal Pretrial Services Judicial Business, Admin. Off. of the U.S. Cts. (Sept. 30, 2025),                          available                          at https://www.uscourts.gov/sites/default/files/document/jb_h9a_0930.2025.pdf (average length of detention for last fiscal year was 317 for all circuits, 252 days for the entire Eleventh Circuit, and 245 days for the Middle District of Florida).  Here, Mr. Edwards spent a total of 856 days from his initial appearance until his bond hearing.  In total, he will have spent over 1,266 days in pretrial detention by the time he is sentenced on June 2, 2026.  Thus, he has spent four times the national average in pretrial detention.  Obviously, the delays were caused in part by his competency issues and the difficulties he had communicating with counsel. Nonetheless, Mr. Edwards has experienced the harsh conditions of a local jail for over three years now.  This pretrial incarceration was particularly hard on Mr.

10

Edwards given his inexperience, his lack of maturity and his struggles with undiagnosed and untreated autism. Further still, as noted above, this is the longest period of time he has been separated from his family, which has been his main source of guidance and support throughout his life. Thus, the length and conditions of his pre-sentencing detention further justify a downward variance.

**III.    THE OTHER PERTINENT SENTENCING FACTORS DO NOT OUTWEIGH EXISTING MITIGATION AND DO NOT CALL FOR A GUIDELINES SENTENCE**

**A.    *The Nature And Circumstances/Seriousness Of The Offense***

The seriousness of Mr. Edwards's offenses are mitigated by the punishment he has already experienced, having served over three years in pretrial detention. By recommending in the plea agreement a sentence of 36 months, which is the equivalent of time served, the government recognizes that Mr. Edwards has already been sufficiently punished for his crimes. *See* Doc. 339, ¶ 6.

Further, the Court must consider the fact that all of the fraudulent funds from the scheme were promptly recovered by law enforcement from bank accounts on September 16, 2020. Doc. 359, ¶¶ 34, 42. Thus, there is no actual loss in this case for restitution purposes. *Id.* As a result, holding Mr. Edwards accountable for $8 million in loss grossly overstates the seriousness of the offense. This serves as yet another reason for the Court to grant a downward variance and

11

impose a sentence of 36 months or time served. *See United States v. Johnston*, 620 F. App'x 839, 857 (11th Cir. 2015) (per curiam) (internal citations omitted) (". . . in cases in which the loss calculation substantially overstates the seriousness of the offense, a downward departure may be warranted."); *United States v. Rosen*, 726 F.3d 1017, 1027 (7th Cir. 2013) (internal citations omitted) ("a court can consider the amount of variance between the intended loss and the realistic possibility of loss when considering an appropriate sentence.").

Additionally, Mr. Edwards did not act alone. Instead, he participated in his offense with his father, whose case was ultimately dismissed, as noted above. Given his lack of maturity and his dependency on his family, it is clear that Mr. Edwards acted at the instruction and direction of others when he sought and signed for the PPP loan in this case. The loan was taken out in the name of ASLAN, the ministry started by his father on June 5, 2018. Doc. 359, ¶¶ 17, 24-27. In fact, on April 3, 2020, just three days before the loan was sought, the ministry changed its registration with the State of Florida and added Mr. Edwards to the business as the registered agent. *Id.* at ¶ 17. Prior to this, it appears that Mr. Edwards had little control decisions over the ministry. More significantly, once the loan was disbursed, the money was transferred from several different accounts until the funds were ultimately deposited into accounts controlled by either Mr. Edwards's

mother or his older sister. *Id.* at ¶¶ 29-33. Some of the funds were later sent to a local title insurance company in connection with the attempted purchase of a residence in Orlando, Florida, with Mr. Edwards's mother listed as the only party on the purchase contract. *Id.* at ¶ 33. When the funds were seized by law enforcement, they were recovered from bank accounts controlled by Mr. Edwards's sister. *Id.* at ¶ 34. Thus, Mr. Edwards had very little decision-making power during his commission of the offense and his family, not him, controlled the money that was fraudulently obtained. For the foregoing reasons, the Probation Office has correctly noted in the PSR "that the role his family played in the commission of the instant offense as it pertains to the defendant's conduct and his total complicity and knowledge regarding the scope of the conduct" is a factor the Court can rely on in imposing a sentence below the advisory guideline imprisonment range. *Id.* at ¶¶ 113.

Courts may grant a downward variance where a defendant plays a lesser role in a criminal conspiracy, even in situations where the defendant does not qualify for a mitigating role adjustment under U.S.S.G. § 3B1.2. *United States v. Gomez*, 215 F. App'x. 200, 202 (4th Cir. 2007) (affirming a 20 month downward variance from the guidelines for a defendant whose role was a "little less pronounced, a little less significant" than the "heavier players."); *United States v.*

*Adelson*, 441 F. Supp. 2d 506, 507 (S.D.N.Y. 2006) (imposing a below-guidelines sentence where defendant joined the conspiracy during its final months).

Here, Mr. Edwards's role was less prominent than that of his co-conspirators, none of whom will be sentenced. He alone is facing the music not only for himself but for others who have avoided accountability in this case. Based on these factors, a downward variance for this defendant is justified and warranted.

### B.     The Need To Promote Respect For The Law And Provide Just Punishment

In considering this factor, the Court should weigh the significant collateral consequences that Mr. Edwards will face for the rest of his life now that he is a convicted felon. A congressional report authored in 2017 by the United States Government Accountability Office ("GAO") demonstrates that there are 641 collateral consequences of a nonviolent felony conviction. *See* GAO Report 17-691, *NONVIOLENT DRUG CONVICTIONS, Stakeholders Views on Potential, Actions to Address Collateral Consequences*, (Sept. 2017), available at https://www.gao.gov/assets/gao-17-691.pdf (last visited on April 6, 2026). Of these 641 collateral consequences, 497 (78%) of them may last a lifetime. *Id.* at 2.

Recognizing the effect of collateral consequences of a felony conviction, one district court has emphasized the need for federal judges to account for such an

14

impact at sentencing. *United States v. Nesbeth*, Case No. 1:15-cr-00018, 2016 WL 3022073, at *1 (E.D.N.Y May 24, 2016) (Block, J.) (varying downward from guideline range of 33 to 44 months imprisonment to one-year of probation for a drug defendant based in part on the number of statutory and regulatory consequences he faced as a convicted felon). *Nesbeth* concluded that "sufficient attention has not been paid at sentencing . . . to the collateral consequences facing a convicted defendant. And I believe that judges should consider such consequences in rendering a lawful sentence." *Id.* As *Nesbeth* establishes, the collateral consequences that Mr. Edwards faces due to his conviction constitutes significant punishment. *See also* Wayne A. Logan, *Informal Collateral Consequences*, 88 Washington Law Review 1103 (2013) ("Today, convict status serves as a perpetual badge of infamy, even serving to impugn reputation beyond the grave").

 **C.** ***The Need To Afford Adequate Deterrence To Criminal Conduct And To Protect The Public From Further Crimes Of The Defendant***

Empirical data undermines any link between lengthy imprisonment and greater deterrence of white-collar crimes. *See, e.g., Adelson*, 441 F. Supp. 2d at 514 ("[T]here is a considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."); U.S. Sent'g

15

Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (May 2004), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last visited May 26, 2026) (research study concluding that fraud had the lowest rearrest rate for recidivism offenders when compared with firearms offenses, robbery, immigration, drug trafficking, larceny, and others); Lucian E. Dervan, *White Collar Overcriminalization: Deterrence, Plea Bargaining, and the Loss of Innocence*, 101 KY. L.J. 723, 740–41 (2012–13) (arguing that the length of a carceral sentence is irrelevant to deterrence of white-collar offenders).  Further, the Department of Justice previously agreed that overly incarcerating defendants is not an effective means of deterrence.  *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (May 2016), available at  https://www.ojp.gov/pdffiles1/nij/247350.pdf (last visited April 6, 2026) (finding that "the data show long prison sentences do little to deter" and stating that "police deter crime by increasing the perception that criminals will be caught and punished").  Thus, the risk of indictment and conviction itself has a significant and adequate deterrent effect.  *See* Daniel S. Nagin & Greg Pogarsky, *Integrating Celerity, Impulsivity, and Extralegal Sanction Threats into a Model of General Deterrence: Theory and Evidence*, 39 CRIMINOLOGY 865, 865 (2001) (certainty of

16

apprehension and punishment generally, and not certainty of imprisonment, is what reduces crime).

Similarly, the empirical evidence does not establish a correlation between sentence length and specific deterrence. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016), attached hereto as *Exhibit A*. On the other hand, "[a]n overly harsh sentence may prove counterproductive, increasing a defendant's likelihood to recidivate." *United States v. Simons*, 375 F. Supp. 3d 379, 384 (E.D.N.Y. 2019) (internal citation omitted); *see also* Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"). Stated differently, prison, by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders, has the potential to actually increase recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data* 1974-2002, 6

Criminology & Public Policy 589 (2007) *see also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance").

Here, Mr. Edwards is a zero-point offender with no history of alcohol or drug abuse.  Therefore, he poses a very low risk of recidivism.  *See United States v. Urbina*, No. 06-CR-336, 2009 U.S. Dist. LEXIS 18239, *7-8 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by, *inter alia*, defendant's lack of criminal record, positive work history, and strong family ties); 28 U.S.C. § 994(j) (Congress stressed "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense.").  Based on the foregoing, a sentence of 36 months or time served would be sufficient to satisfy the goals of general and specific deterrence.

### D.   *The Need To Provide Mr. Edwards With Treatment, Training, And Education*

Mr. Edwards has no history of substance abuse.  Doc. 359, ¶ 87.  He will be deported upon completion of his sentence in this case.  Thus, there is no need to prolong his incarceration in order to provide him with correctional treatment.  *See*

18

*Tapia v. United States*, 564 U.S. 319, 335 (2011) ("As we have held, a court may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation.").

### E.    The Kinds Of Sentences Available And The Sentencing Guidelines

The Court "may not presume that the Guidelines range is reasonable" and must make "an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.  Further, the Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.* at 47.  The guidelines can produce sentencing ranges "greater than necessary to achieve § 3553(a)'s purposes, even in a mine-run case."  *Kimbrough*, 552 U.S. at 109-10.  For these reasons, "[t]he sentencing judge may not perfunctorily impose a guidelines sentence or even presume that such a sentence is appropriate in a given case."  *United States v. Warner*, 792 F.3d 847, 855 (7th Cir. 2015).  The Eleventh Circuit has further stated that "[t]here are…many instances where the Guidelines range will not yield a reasonable sentence."  *United States v. Hunt*, 459 F.3d 1180, 1184  (11th Cir. 2006).  In sum, this Court is not required to follow the guidelines and a sentence of 36 months or less is available, and would be sufficient to satisfy the sentencing factors discussed herein.

19

### F.    The Need To Avoid Unwarranted Disparities

Section 3553(a)(6) forbids not all sentencing disparities but only "unwarranted" ones "among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The imposition of a 36 month sentence for Mr. Edwards would not create unwarranted disparity. In fact, other defendants convicted of PPP loan fraud have received similar sentences from other district courts. *See* e.g., *United States v. Casey Crowther*, No. 2:20-cr-00114-JES-M_M (M.D. Fla. June 29, 2021) (Doc. 164) (Steele, J.) (press release available at https://www.justice.gov/usao-mdfl/pr/fort-myers-businessman-sentenced-three-years-federal-prison-covid-relief-fraud-and) (37 months imprisonment for a Fort Myers businessman who sought and obtained $2.1 million in PPP loans and also participated in a $1.3 million mortgage fraud scheme; defendant used some proceeds to purchase a $700,000 boat; defendant was convicted after trial); *United States v. Samer Kammo*, No. 2:23-cr-20296-JJCG-APP (E.D. Mich. Feb. 17, 2026) (Doc. 98) (Grey, J.) (press release available at https://www.justice.gov/usao-edmi/pr/shelby-township-resident-sentenced-multi-million-dollar-pandemic-assistance-fraud) (defendant received a sentence of 36 months imprisonment for his role in a $2.5 million PPP loan fraud scheme; restitution in the same amount was ordered indicating that the government did not recover the money); *United*

20

*States v. Joshua Bellamy*, No. 0:21-cr-60064-RKA (S.D. Fla. Dec. 14, 2021) (Doc. 60) (Altman, J.) (press release available at https://www.justice.gov/archives/opa/pr/former-nfl-player-sentenced-more-three-years-prison-covid-19-relief-fraud) (former NFL player sentenced to 37 months imprisonment for fraudulently obtaining $1.2 million in PPP loans and using funds on personal items such as jewelry and Casino trips; this defendant also sought PPP loans for family and close associates and paid kickbacks to a co-conspirator); *United States v. Jesika Blakely*, No. 1:20-cr-00296-JPB-CMS (N.D. Ga. Feb. 8, 2023) (Doc. 631) (Boulee, J.) (press release available at https://www.justice.gov/usao-ndga/pr/fraudster-receives-prison-sentence-illegal-paycheck-protection-program-scheme) (defendant sentenced to 36 months imprisonment and ordered to pay $5,348,498.89 in restitution, thus true loss amount was significant).

In addition, Judiciary Sentencing Information ("JSIN") statistics compiled by the Sentencing Commission for similarly situated defendants demonstrates that over the last five fiscal years those offenders whose primary guideline section, offense level, and criminal history category were the same as Mr. Edwards, received an average sentence of 33 months imprisonment, with the median length of imprisonment imposed being 34 months. *See* U.S. Sent'g Comm'n, Judiciary

Sentencing            Information            (available            at https://jsin.ussc.gov/analytics/saw.dll?Dashboard) (selecting primary guideline U.S.S.G. § 2B1.1, criminal-history category I, and total offense level 22) (results attached hereto as *Exhibit B*).  Courts have relied on data from JSIN in determining the appropriateness of a sentence.  *See e.g. United States v. McDaniel*, 59 F.4th 975, 979 (8th Cir. 2023); *United States v. Arias*, Case No. 3:11-cr-00494-HZ-1, 2023 U.S. Dist. LEXIS 54891, at *6 (D. Or. Mar. 28, 2023); *United States v. Lampkin*, Case No. 3:15-cr-00005-SLG, 2023 U.S. Dist. LEXIS 140971, at *4 (D. Alaksa Aug. 11, 2023).

Further, as noted above, the Court should consider the fact that Mr. Edwards is the only individual to be sentenced in connection with the ASLAN PPP loan even though it appears others, who have avoided charges, will not face sentencing.

## IV.   CONCLUSION

Based on the arguments and authority set forth herein, as well as the information attached hereto, Mr. Edwards respectfully requests that this Court grant a variance and impose a sentence of 36 months or less.  Such a sentence not only satisfies the requirements of § 3553(a), but also accomplishes the ultimate goal of justice in sentencing.

Respectfully submitted this 26th day of May, 2026.

/s/ Andrew C. Searle
**ANDREW C. SEARLE, ESQ.**
Florida Bar No.  0116461

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2026 I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all parties of record.

/s/ Andrew C. Searle
**ANDREW C. SEARLE, ESQ.**
Florida Bar No.  0116461
**SEARLE LAW P.A.**
200 East Robinson Street, Suite 1150
Orlando, Florida 32801
Telephone: 407-952-0642
Email: andrew@searle-law.com
*Attorney for Jonathan Edwards*

23